[Filed April 16, 1888.]

## MEYER, WILSON & CO., APPELLANTS, v. THOMPSON, DE HART & CO., RESPONDENTS.

STATUTE OF FRAUDS.—The evidence of an acceptance and receipt of a part of the property, under a parol agreement for the sale of personal property for the price of fifty dollars or upwards, when no part of the price was paid at the time of making it, though insufficient to preclude the defendant from claiming that the agreement had not been fulfilled, and its terms complied with, yet may be sufficient to answer the requirements of the Statute of Frauds in that particular.

SAME.—Where T. D. & Co. made a parol agreement to purchase from M. W. & Co. a cargo of the best Lancashire steam coal, then on board of a certain vessel bound to P., at a certain price per ton, amounting to several thousand dollars, and M. W. & Co., in an action against T. D. & Co. for damages for refusing to take and pay for the coal in accordance with the agreement, gave evidence tending to show that when the vessel arrived at P. with the coal on board, an agent of the plaintiffs telephoned from their place of business to the defendants, at their place of business, notice of its arrival, and inquired of them where they wished to have the coal, and the defendants answered, that if the vessel could discharge it where she was without incurring expense or charge to them, they would take it there, but if not, to send the vessel up to their dock; and in pursuance of which the plaintiffs sent the vessel to their dock, which their dock-master had prepared to receive the coal, and discharged thereon thirty or forty tons of the coal; and the defendants' drayman, whom they had instructed the previous night to be at the dock the next morning, when the coal was expected to arrive, to haul it, took from eleven to fifteen tons of the coal to defendants' coal yard, back on another street, which their yard-master by their order had prepared to receive it; that the defendants did not see the coal, or come to the dock where it was being discharged, until after a considerable portion of the thirty or forty tons had been discharged, and the eleven to fifteen tons had been hauled over to the coal yard, and then refused to receive it. *Held*, that the evidence if accredited by the jury would have justified them in finding that there had been such a delivery and acceptance of a part of the coal under the agreement as would take it out of the Statute of Frauds; and that the court should have instructed the jury that if they found the state of facts which such evidence tended to prove, they should find the agreement valid.

CHARGE TO JURY.—Under the statute of this State, it is error for the court to charge the jury as to the effect and value of certain of the evidence given at the trial.

APPEAL from Multnomah County.    Reversed.

*R. L. McKee, Ira Jones,* and *George W. Yocum,* for Appellants.

*Emmons & Emmons,* and *W. H. Adams,* for Respondents.

THAYER, J.—The appellants herein commenced an action in the said Circuit Court against the respondents upon a contract for the sale of certain coal from the former to the latter. They

alleged in their complaint that on or about the twentieth day of August, 1884, they sold to respondents a shipment of coal, consisting of 611 and a fraction tons of the best Lancashire steam coal, at the agreed price of $7.50 per ton, amounting in all to $4,584.59, said coal then being on board the German bark Werra, which was at sea, and was to arrive soon at the city of Portland. That on or about the twenty-eighth day of October, 1884, said bark Werra arrived at said city of Portland with the said coal on board; that afterwards, on or about the ninth day of November, 1884, appellants, at the instance and request of the respondents, and in pursuance of said contract of sale, moved and placed said bark with said coal on board at the respondents' dock, at the foot of Yamhill Street in said city, and then and there as requested delivered said coal to respondents; that thereupon the respondents proceeded to take, and did take out and from said bark, and accept and receive into their possession while said bark was at said dock, about twenty-four and a fraction tons of said coal, pursuant to said sale, and ever since had, and did then retain the same; that after having taken from said bark said last mentioned amount of coal, the respondents refused to receive and take the residue thereof, although often requested so to do by appellants; that upon the persistent refusal of respondents to receive such residue, and to pay for any portion of said coal, appellants gave them notice that they would sell the residue remaining in said bark upon the respondents' account, and hold them responsible for any deficiency in the result, and for the expense of keeping and reselling the same; that thereafter the appellants acting in good faith resold said residue of said coal for account of respondents for the sum of $2,813.60; that the expense attendant upon the keeping of said residue and upon such resale was $413.74, which appellants were compelled to pay and did pay by reason of the breaches of said contract by respondent; that respondents had not paid the deficiency, amounting to $2,184.73, or any part of it, and for which amount the appellants demanded judgment.

The respondents in their answer to the complaint denied all the material allegations thereof, and set up as new matter of

defense that the shipment of coal attempted to be delivered to them had been sold to one C. H. Bacon at the same price as that claimed in the alleged sale to respondents, and was agreed to be taken from the wharf when discharged by the said bark Werra; that said Bacon had not resold the coal, and that at the time of the arrival of said bark at the city of Portland the contract of sale to him was in full force, and that he was liable thereon to appellants according to the terms of the contract, and was ready and willing to receive and pay the cash for said shipment upon its delivery.

The appellants in their reply to such new matter admitted the sale of the coal to Bacon at the price, and upon the terms therein alleged; but they denied any knowledge, etc., as to whether the latter had resold it; denied that the contract of sale to Bacon was in full force, or that the latter was liable to them, or was ready or willing when the Werra arrived to receive or pay the cash therefor. And for a further reply alleged that prior to making the contract with respondents for the sale of the coal to the latter, said Bacon had abandoned and forfeited all his rights under the contract with him, and had refused and declined to fulfill his part thereof, and that appellants were duly notified of the fact and assented to such abandonment; that the contract with Bacon was rescinded by mutual assent of the parties thereto, prior to making the contract with respondents. And for a further reply alleged that when the sale was made to Bacon he was doing business in the city of Portland, engaged in keeping a coal yard, buying and selling coal, and that within a short time after making the contract with him, and before the bark Werra arrived with the coal at Portland, he sold out his coal yard, stock on hand, and business to respondents, and transferred to them all his rights under the contract, and that the respondents duly notified appellants of such transfer, and that the latter assented thereto and released Bacon therefrom, and then made the sale of the coal to respondents, as alleged in the complaint, and for the same price and upon the same terms; and that the latter agreed to receive and accept said coal at said price and on said terms.

The case was tried by a jury, and the respondents recovered a verdict, upon which the judgment appealed from was entered. The grounds of error upon which the appellants rely on the appeal are mainly exceptions to the charge of the court to the jury as to the acceptance of the coal by the respondents. It appears from the bill of exceptions that the appellants gave testimony at the trial, tending to prove the allegations of their complaint and reply.

Mr. E. D. McKee, the general managing agent of respondents for their house in Portland, testified as follows: "On or about the twentieth day of August, 1884, I sold six hundred tons of the best Lancashire steam coal to the firm of Thompson, De Hart & Co., which coal was to arrive by the German bark Werra. In the latter part of August, 1884, I had a conversation with Mr. Honeyman, of Thompson, De Hart & Co., in regard to some coal. I wanted to sell him another cargo. It occurred in this way. He says: 'Well, I will not take another cargo now because we have a cargo coming from you that we took from Bacon.' I asked him if he knew the terms of that contract, and if he would take it on the same terms, and he said: 'Yes.' I asked Mr. Honeyman if he had the contract; he said: 'Anyway if I have not the contract; I have seen the contract;' and he said he would take it on the same terms. The plaintiffs are partners now, and have been for three years before I made this contract. The bark Werra arrived here in the river in the latter part of October, 1884, and I telephoned up from my office to Thompson, De Hart & Co., and asked them where they wished the coal. They answered and said if the bark could discharge it where she was, back of our dock, without incurring wharfage or charge to them, they would take it there; but if we could not to send the bark up to their dock at the foot of Yamhill Street. We could not discharge the coal on our dock without charge, and so we sent the bark up to their dock, and the next morning there was forty or fifty tons of the coal discharged on defendants' dock. I think it was Mr. R. H. Thompson that telephoned back to me to send the bark up to their dock if it could not be discharged without cost to defendants.

Defendants hauled from their dock to their coal yard on Fourth and E streets about from eleven to fifteen tons of the coal that was unloaded on their dock, and then, about that time, they stopped the ship from unloading, and told me they would not take the coal, and they did not take any more of it."

The appellants then introduced evidence tending to prove that respondents ordered their drayman to remove said coal from respondents' dock to their coal yard over on Fourth and E streets, in Portland, and that in obedience to said order said drayman did remove and haul from fourteen to fifteen tons over to their said coal yard, and introduced evidence tending to prove that respondents ordered their warehouse or dock-master, Mitchell, to prepare the dock to receive this coal, and that he did prepare this dock, and that forty or fifty tons were discharged on the dock; and that respondents ordered their yard-master, Walter S. Thompson, to prepare the yard and get it ready to receive this coal, and he did prepare it, and he did receive from ten to fifteen tons hauled there by their drayman, and that respondents paid the drayman for his services.

It also appears from the bill of exceptions that on the trial of said action, R. H. Thompson, one of said defendants, admitted that at the time E. D. McKee telephoned up to defendants asking them where they wanted the coal, he, for defendants, telephoned back to McKee in answer, "to send the bark up to defendants' dock unless the plaintiffs could discharge the coal at plaintiffs' dock without charge to defendants." And it was admitted by defendants that forty or fifty tons were discharged on their dock, and that their drayman who did all their hauling was ordered the night before the coal was discharged to be on hand the next morning to haul the coal, and that said drayman commenced at the usual hour in the morning and did haul from eleven to fifteen tons to defendants' coal yard. And it is admitted that defendants did not at any time examine or inspect the coal until after several tons had been discharged upon their dock, and that defendants did not see the coal or come to the dock where it was being discharged until after a considerable portion of the forty or fifty tons had been discharged,

and the eleven to fifteen tons had been hauled over to their yard.

The court in its instructions to the jury gave among others the following: "The mere receiving, that is, taking into their possession by the defendants of some portion of this coal, without intending to accept it as an act completing the contract, or as a partial delivery of the thing bought, would not be enough. You must find from all the evidence in the case, from all the acts of the defendants, taking them all into consideration (if you find the contract and agreement was made that I have spoken of) that what the defendants did in regard to obtaining possession, or taking possession of that coal which was taken out of the vessel, was with the intention to buy the cargo and accept so much as a partial delivery of the cargo or the amount bought. The circumstance that this drayman took the coal from the wharf and carried it down to their yard is not alone sufficient; nor the circumstance that the wharfinger, Mitchell, prepared the wharf for the reception of the coal, and attended to the receiving of it on the wharf, is not alone sufficient. But you should take into consideration all that they did from the time of directing the vessel to be brought to their wharf and unloaded up to the time when they countermanded the order for unloading the coal, or directed it to be countermanded, and ask yourselves and answer the question under the testimony: 'What did they mean or intend by it?' Did that order to the drayman to be on hand early in the morning, leaving him to do as he was accustomed to do when cargoes of coal would be unloaded for them, take it up to their yard, without being themselves present until a later hour in the day, indicate an intention to take the coal in fulfillment of the contract? to accept it as well as to receive it into their possession? If you find from all the testimony—if you believe from all the testimony—that that was the intention, then you have a right to consider and should consider the contract as completed."

The court also gave the following instruction: "Then if you find there was a contract made and completed as I have defined it to you, and that the coal answered the description in the con-

tract as best Lancashire steam coal, and if the defendants refused
to take it, then your next inquiry is, did the plaintiffs give notice
to the defendants of their intention to sell the coal on account of
defendants, and hold defendants responsible for the deficiency
between what they could obtain for it and the contract price?
That notice need not have any particular form.   It need not
have been in writing.   If it was made known to the defendants
that such was the intention of plaintiffs that is sufficient."

Exceptions were duly taken to these two instructions, and they
constitute the principal exceptions relied upon by the appellants
on appeal.

The question in the Circuit Court involved the validity of the
alleged agreement to purchase the coal.   The agreement not
being in writing, and no part of the purchase money having been
paid, it was incumbent upon the appellants in order to take the
case out of the Statute of Frauds to prove that some part of
the coal had been accepted and received by the respondents.
The courts have attempted from time to time to establish in
such cases certain tests as to what constitutes an acceptance and
receipt of some part of the property; but owing to the fact that a
shade of difference is generally found to exist between the various
cases, such tests have not been of much practical use.   Almost
every one, I apprehend, will conclude, after an examination of the
numerous and somewhat conflicting decisions upon the subject,
that the intention of the legislature would as often and as
effectually be carried out by observing and following the terms
of the statute itself, as by attempting to keep in line with the
thousands of adjudications which have been had regarding it.

The statute obviously intended that something more than the
negotiations of the parties to an oral agreement for the sale of
personal property at the price of fifty dollars or upwards should
be shown in order to render it valid; that mere words would not
be sufficient; that an overt act of the parties corroberative of
the fact of the agreement was essential to make it binding.   It
required that the buyer accept and receive some part of the
property, or pay at the time some part of the purchase money,
otherwise the bargain would have no force.   It did not intend

to require an over-nice performance of such acts. It was enacted in view of the mode and manner in which business affairs were usually conducted. It was not adopted to obstruct the free course of trade, nor to afford an excuse for violating commercial integrity. The acceptance and receipt of some part of the property were expected to occur in the usual way. The acceptance is not necessarily inferable from the mere receipt of the property. The vendee, as was said in Benjamin on Sales, must have exercised, or have had the means of exercising his right of rejection before he can be claimed to have accepted it. The agreement may be, and often is, to purchase a particular kind, quality, or grade of commodity, which is subsequently delivered to the buyer without his having had an opportunity to inspect it. The receipt of the article, under such circumstances, would not necessarily constitute an acceptance. *Remick* v. *Sanford*, 120 Mass. 316, and *Bacon* v. *Eccles*, 43 Wis. 227, were cases of that kind.

When a party agrees to purchase goods of certain kind or quality, which he has never seen, he should have the right when they are forwarded to him to examine them in order to ascertain whether or not they are such as he bargained for. It is held by the current of authorities that a party is not bound to accept merely because the goods sent are entirely in accordance with the agreement, and therefore he ought to accept. I am satisfied, however, that a more liberal construction of the statute, in a certain class of cases, would not impair its efficacy, and at the same time would prevent a fraudulent use of it.

When a party has promised to accept merchandise which he has agreed to purchase, and it corresponds in every respect with the terms of the agreement, he ought not, when it is sent him, be allowed to reject it upon any frivolous pretext. Such a mode of dealing would occasion a hardship, and tend to destroy confidence in commercial transactions. When a party has been induced to pack and send to a vendee a bill of goods at a considerable cost and trouble, been deprived of the chances of selling them to other customers, the goods have been taken and delivered to the vendee, and opened and inspected by him, he should not, because, forsooth, there has been a decline in the market, be

allowed to resort to the subterfuge that they are not the kind or quality ordered, and be thereby excused from receiving them. The law, especially a statute to prevent frauds and perjuries, should not in deference to any refined subtlety countenance or permit chicanery. Some of the decisions in reference to that question, I am happy to learn, do disprove of such practice.

In *Smith* v. *Stoller*, 26 Wis. 671, the Supreme Court of that State held, that "where tea, valued at more than fifty dollars, was sold by sample, and a chest of it delivered to the buyer as in pursuance of the contract, which after opening it he undertook to return, it was not error to instruct the jury in substance that if he received the tea with intent to accept it, in case it should agree with the sample, and if they found that it did in fact agree with the sample, then there was a complete acceptance, and he was liable for the price." The same court, in *Bacon* v. *Eccles*, 43 Wis. 227, suggested that *Smith* v. *Stoller* was an advance doctrine upon the subject, and that it went as far as the courts could safely go to sustain a constructive acceptance of goods delivered under a parol contract of sale, otherwise void by the Statute of Frauds. But I do not believe that it went any too far; do not think the buyer under the circumstances should have been permitted to claim that he had not accepted and received the article. He agreed to accept and pay for the tea; it was forwarded to him at his request, and answered the description of that which he had agreed to purchase. To hold, therefore, under the circumstances that he had accepted and received it was just.

No formal unequivocal acceptance of the article was shown, as some fastidious courts seem to intimate should be, but he had said he would accept it if of the kind and quality represented; and placed at his refusal to keep it upon the ground that it did not agree with the sample, which ground was proved to be false. If he had notified the vendor upon the arrival of the tea that he would not receive it, that he would not abide by his agreement, was not bound by it, his defense to the action, in my estimation, would have been more tolerable; but when he attempted to add to his own perfidy a disparagement of the

vendor's goods, and to asperse the latter's reputation for fairness and integrity in commercial dealings, he should have been confined in his defense to those grounds.

In the noted case of *Tibbett* v. *Morton*, 15 Q. B. 428, it was held by the Queen's Bench that there might be an acceptance and receipt within the meaning of the act, without the buyer having examined the goods, or done anything to preclude him from contending that they do not correspond with the contract; that the acceptance, to let in parol evidence of the contract, was different from that which affords conclusive evidence of the contract having been fulfilled. The doctrine announced in the latter case was put upon the grounds that the buyer had dealt with the goods as owner, and that a constructive acceptance might be inferred therefrom; but I am unable to discover any objection for applying it to a case where it is evident that the buyer intended to waive the right to examine the goods as preliminary to his acceptance and receipt thereof, or has had an opportunity to examine them but neglected to do so; nor to a case where the buyer requests the goods sent him, intending to accept and receive them if of the kind and quality bargained for, and the goods are delivered accordingly, and his refusal thereafter to keep them is upon the grounds that they were *not* of the kind and quality bargained for. Such acceptance and receipt would not, of course, preclude the buyer from showing that the goods did not comply with the terms of the agreement, but would be sufficient to answer the requirement of the statute, and leave the real matter in dispute between the parties open for determination.

In the case under consideration the evidence, as shown by the bill of exceptions, was ample and sufficient, if accredited by the jury, to justify a finding that a part of the coal was accepted and received by the respondents. The agreement by them to purchase the coal, and the arrangement made after the arrival of the bark in the river as to where the coal should be delivered, were testified to by Mr. E. D. McKee, and the latter affair was virtually admitted by Mr. Henry Thompson, one of the respondents. Nor does there appear to have been any conflict in the

evidence as to the bark, with the coal on board, having been moved to the respondents' dock, prepared at their instance for the discharge of her cargo, and of the coal yard being prepared to receive it; and that forty or fifty tons of the coal were unloaded upon the dock in pursuance of the arrangement, and from eleven to fifteen tons thereof hauled therefrom to the respondents' coal yard by a drayman employed by them to haul it.

These several acts of the respondents constituted cogent proof that there was an acceptance and receipt of a part of the property. It is true that the respondents did not inspect the coal until after the discharge of the several tons upon the dock. They did not see it, or come to the dock until after a considerable portion of the forty or fifty tons had been discharged, and the eleven or fifteen tons hauled over to the yard. For that matter, however, they might never have seen the coal and yet be chargeable with its acceptance and receipt. They had the opportunity to see and inspect it before they had any part of it hauled from the dock to their coal yard. I think it was their duty, after they agreed that the coal should be discharged at their dock, to be there before it was unloaded, and exercise their right of acceptance. then.

It is held by the authorities upon the subject that the acts of the vendor are not sufficient to answer the requirements of the statute; but the discharge of the coal upon the dock was not the act of the appellants alone; the respondents co-operated with them in the affair as much so as though they had personally assisted in it. But whether the discharge of the coal upon the dock by itself was sufficient or not to constitute an acceptance and receipt of it need not be considered. The hauling away the portion of it by the respondents to their coal yard was their own act, and if it did not amount to an acceptance and receipt of the coal, I can hardly imagine what would. It surely could not be contended that it was done in order to inspect the coal, or for any purpose other than to exercise proprietorship over the property.

In view of the agreement to purchase the coal, and of the

several acts of the respective parties done in pursuance thereof, there can be no other conclusion than that the respondents took and received the part hauled to their coal yard under the agreement and as their own property.   The respondents may have been disappointed in the quality of the coal; it may not have been merchantable, and they have had the right to refuse to receive the remainder of it upon that ground.   That sort of defense was, perhaps, open to them, and I can see no other question in the case to litigate.   It was, of course, for the jury to say whether the evidence referred to in the bill of exceptions was true or not; but if they found it to be true, they should have found that there was an acceptance and receipt of a part of the property sufficient to render the agreement a binding contract between the parties.

The tendency of such evidence was to show that fact, and the court should have so instructed the jury, unless there was other and different evidence in the case from that disclosed by the record before us.   The charge of the court to the jury as a matter of abstract law is, in the main, correct; but as applicable to the evidence referred to, was misleading.   Altogether too much stress was laid upon the question of the intent of the respondents in their taking and hauling the part of the coal to their coal yard.   Parties are supposed to intend the natural and ordinary consequences of their acts.   Respondents in taking the coal from the dock to their coal yard could not possibly be presumed, under the circumstances of the case as shown to this court, to have intended anything different than I have indicated.

The jury was evidently led to believe from the charge that the respondents in view of the facts might have had some latent analogous intention in regard to the coal hauled to their coal yard.   It unfortunately was calculated to set them to speculating in their minds in regard to what certainly must have been a vagary.   No fact is shown of any other intention than that suggested.   The coal could not possibly have been taken to the coal yard to inspect its quality; it had no hidden defects evidently.   If it was too fine, contained too much waste matter, as some of the witnesses intimated, the fault was patent.   The respondents

had no occasion to remove it to their yard to ascertain that fact. It is laid down in Benjamin on Sales, section 145, and supported by eminent authority, that "if the vendee does any act to the goods, of wrong if he is not the owner of the goods, and of right, if he is the owner of the goods, the doing of that act is evidence that he accepted them." The drayman may have had no authority to accept the coal; but he was directed by the respondents the night before it was discharged upon the dock to be on hand the next morning to haul it to the coal yard, and his act in that respect was the act of the respondents, and which, as I regard it, was a waiver of the right to reject the coal on the grounds of the invalidity under the statute of the agreement to purchase. The intention of the respondents in the affair must be gathered from their acts, and not from some supposed possible condition of their minds. They probably did not think anything about it when they directed their drayman to be on hand to haul the coal, except the taking it under the agreement. They would doubtless have regarded it as an affront if sued for trespass *de bonis asportatis* on account of the act, and have claimed as a defense the right to take the coal as of their own property. Again, the court usurped the functions of the jury when it told them that the circumstance of the drayman taking the coal from the wharf and carrying it down to the coal yard, nor the circumstance that the wharfinger, Mitchell, prepared the wharf for the reception of the coal, was not alone sufficient to establish the intention to accept the coal which was taken out of the vessel as a partial delivery of the cargo, or the amount bought. The jury were the judges of the effect and value of that evidence. Receiving the coal at the dock, and hauling the part of it to the coal yard, were facts of the case which the court had no right to present to the jury.

We had occasion at the last term of this court to consider that question in the case of the *State* v. *Huffman*, reported in 16 Or. 15. The instruction in regard to the appellants giving notice to the respondents of an intention to sell the coal need not be considered, as the bill of exceptions shows that the appellants introduced evidence tending to prove that they, by they manager,

Mr. McKee, notified and informed their respondents immediately after the latter refused to take the coal that they, appellants, would sell the coal for account of respondents and charge them with any loss or deficiency. The latter charge, therefore, if erroneous did not injure the appellants. Whether it was erroneous or not we express no opinion. We deem the exception to the other charge to have been well taken.

The judgment appealed from will therefore be reversed and the case will be remanded for a new trial.

LORD, C. J., dissenting. — Upon the arrival of the bark the conduct of the defendants indicate that they acted upon the assumption that the cargo of coal was conformable to their understanding of the agreement, and such as was suitable for the purposes of their trade.

The circumstances under which the contract originated, and the subsequent conduct of the defendants in relation to it, constitute the chain of facts, or the transaction itself, from which the intention of the defendants in receiving the coal, whether absolutely or only conditionally, is to be inferred. The court instructed the jury, in effect, that it was not enough to take any particular fact or isolated circumstances, however decisive it may appear in itself, to determine the question of acceptance; but that all the facts and circumstances surrounding the transaction must be taken and considered together in order for them to determine whether there had been such an acceptance and receipt by the defendants as the law contemplated. This was but giving heed to the admonition of the books, "that it should be steadily borne in mind that the acceptance and receipt contemplated by the Statute of Frauds, and as adjudged by the cases, must always be governed by the circumstances surrounding the transaction, as to whether there has been such acceptance and receipt." (Baker on Sales, § 282 *a*.)

It seems to me that the instruction was a plain and correct exposition of the law.