MARIA D. WAITE v. JAMES E. McKELVY.[1]

January 12, 1898.

Nos. 10,920—(218).

**Statute of Frauds—Oral Contract of Sale—Acceptance of Goods—Evidence.**
> *Held*, that the evidence in this case did not show, as a matter of law, that a verbal contract for the sale of the chattels in question was made and so far executed as to satisfy the requirements of the statute of frauds, and that the trial court erred in directing a verdict for the plaintiff.

**Same—Delivery to Carrier Designated by Buyer.**
> The mere delivery of personal property to a carrier designated by the buyer does not authorize the carrier to accept it, so as to take an oral agreement for the sale of it out of the statute of frauds.

**Same—Defense of the Statute—Availability to Third Persons—Sheriff—Levy on Execution.**
> The rule that the defense of the statute of frauds is personal to the parties to the oral contract has no application to the sheriff, where he levies on the chattels, which are the subject of the contract, before the requirements of the statute necessary to a valid sale have been satisfied.

Appeal by defendant from an order of the district court for Stearns county, Baxter, J., denying his motion for judgment notwithstanding the verdict or for a new trial, after a verdict for plaintiff by direction of the court. Reversed.

*Calhoun & Bennett*, for appellant.

*J. D. Sullivan*, for respondent.

START, C. J.

This was an action of claim and delivery to recover possession of a car load of wheat, rye, buckwheat, flour, chicken feed and sweepings, which was conceded to be at one time the property of Clarke Waite, a son of the plaintiff, but which was sold by him to the plaintiff, as she claims, before it was levied upon by the defendant, as sheriff, by virtue of a writ of attachment issued in an action against him as his property.

[1] Reported in 72 N. W. 727.

The only issue in the case which it is necessary here to consider is the ownership of the property. The trial court, at the close of the evidence, directed the jury to return a verdict for the plaintiff for the property, and the defendant appealed from an order denying his motion for a new trial.

The assignments of error raise the general question whether the evidence showed conclusively, and as a matter of law, that the title of the property had passed from the son to the mother before it was seized by the defendant. The evidence is undisputed that Clarke Waite, for some ten months prior to November 16, 1896, the day on which the defendant took the property, was in the milling business at Cold Springs, Stearns county, operating a flour mill belonging to the plaintiff, and became indebted to her for rent in a sum in excess of the value of the property. The plaintiff claims that the property was delivered to her on board of the cars at Cold Springs, pursuant to an agreement between herself and son that he should deliver it in part payment of the rent due her.

The evidence in support of this claim may be summarized as follows: The son testified, when first on the stand, that he loaded the property in a car on the side track at the Cold Springs station, and took a way bill from the railway company, in which the consignee and destination named were "M. D. Waite [the plaintiff], St. Cloud, Minn., via Great Northern Railway." That the property, among other articles, consisted of 18,000 pounds of chicken feed and 1,500 pounds of sweepings; also wheat and rye, and flour of each, and corn meal,—all of which was his property when taken from the mill. That it was so loaded and billed, pursuant to an agreement he had with his mother, in payment on rent he owed her, but the terms of the agreement he did not state. That he obtained the way bill about six o'clock in the evening, and has ever since retained it. That the next morning the defendant took the property from the car, it still remaining on the track. The plaintiff, in her examination in chief, testified as follows as to the contract:

"Clarke Waite, my son, never paid me any rent for the use of that mill while he had it. He promised to turn me over flour or feed to apply on the rent. It might have been a couple of weeks before he quit there,—two or three weeks,—I don't remember as to the time;

two or three weeks before he quit up there at Cold Springs. I saw him about it at St. Cloud. I was not at Cold Springs. He never paid me anything else on the rent."

And on her cross-examination she testified as follows:

"Q. There were no particular sacks of flour, or anything of that kind, mentioned? A. Well, what we could use upon the farm." "Q. And he was to do the selecting? A. Yes, sir." "Q. All the talk there was, he said he would send a car load of flour and feed to apply on rent? A. Yes, sir." "Q. You contemplated that he was going to break up business? A. I suppose so; I don't know as it was decided. Q. You expected to get a car load when he broke up business? A. I expected it in part payment for the rent. Q. This car load was to be sent to you when he broke up business? A. It was to be sent to me when he could. I didn't know at that time whether it was decided he was going to break up. I don't know that we knew at that time what would be done with the mill. Q. There was no specific amount of flour and feed mentioned? A. What he could get in a car. Q. Was there anything said about how much flour or how much feed there should be? A. Only that there should be a car load. I didn't know how many pounds constituted a car load. He was to send me a car load. Q. In this talk with Clarke about turning over flour and feed, there was nothing said about how much of the car should be flour, and how much should be feed? A. No, sir; what I could make use of he was to send me." "Q. What else was spoken of? A. I told him whatever we could make use of that he should send; to make out the car load for me,—what he could send in a car." "Q. And that is all the talk there was, substantially? A. That is all I remember about. Q. You never gave him any receipt for rent, or anything of that kind? A. No, sir. Q. No writings ever passed between you at all in regard to this matter in any way? A. I except the lease. Q. Except the lease, that was all? A. Yes, sir. I did not receive the car. I could not give him a receipt for that which I did not receive."

The son was recalled, and testified that the "car load of stuff" was to be delivered on the track at Cold Springs in car.

"Q. Tell us what you said and what she said. A. Well, we had a conversation about my owing her for rent, and about my getting her something for pay, paying her something to be applied on the rent I owed her; and I told her I would deliver this car of flour on the track at Cold Springs in car, and that was the talk. Q. Do you remember distinctly about that now? A. Yes, sir; I do. Q. Anything said about where you should ship it? A. The understanding was it was to be used— Q. Was there anything said about where

it was to be shipped? A. I think so; yes. Q. What was it? A. She said it was to use on her farm."

There was no evidence as to the size of the plaintiff's farm, or as to what she needed or could use upon it. The property so placed in the car was all the property the son had in the mill at the time he closed it up, and there was evidence tending to show that he was then insolvent. Whether the parties made any definite contract, if so, what were its terms, and whether a delivery in accordance with the contract was made to a designated carrier of such property in kind and quantity as the plaintiff was bound to accept, were questions of fact under the evidence for the jury. The evidence was not so definite and conclusive on these questions as to enable the court to decide them as a matter of law. If it be conceded that the evidence establishes an oral contract to the effect that the son should send the plaintiff to apply on rent a car load of flour and feed, such as she needed and could use on the farm, to be selected by him, instead of an indefinite promise and understanding that he would at some indefinite future time do so, if he could, still it was a question for the jury whether what was placed in the car was in quantity or kind such that she was bound to accept. His right of selection was limited to what she could use on her farm.

There was no evidence that would justify the conclusion that the railway company was agreed upon as the plaintiff's agent to receive and accept the flour and feed for her, as her counsel claims. The mere receipt of them by the carrier is not sufficient to take the case out of the statute of frauds. There must have been also an acceptance,—that is, some act on the part of the buyer showing an intention to accept and appropriate the chattels unconditionally as owner. Taylor v. Mueller, 30 Minn. 343, 15 N. W. 413; Fontaine v. Bush, 40 Minn. 141, 41 N. W. 465; Shindler v. Houston, 49 Am. Dec. 339, and note; Browne, St. Frauds, § 327b. The question of receipt and acceptance is generally one of fact for the jury, under proper instructions.

With reference to another trial, it is proper to add that the rule, relied on by the plaintiff, to the effect that the defense of the statute of frauds is personal to the parties to the verbal contract, and cannot

be invoked by third parties, has no application to this case, for the defendant, as sheriff, has, by virtue of his levy, all of the title and right to the property that the seller had, if any, at the time the levy was made. If the verbal contract had not then been so far performed as to satisfy the statute, the verbal contract was, in the language of our statute,[2] void, and no title passed to the buyer as against the sheriff. To permit the parties to the verbal contract, after the levy, to waive the statute would encourage perjuries, and, as was said in Ely v. Ormsby, 12 Barb. 570, "open wide the doors for frauds, and be a very convenient method of enabling a party to put his creditors at defiance." This proposition is supported by the commanding weight of authority. The adjudged cases on the question are collected and analyzed in Browne, St. Frauds, §§ 138f–138j. The author, however, while admitting that the rule that where there has been no satisfaction of the statute up to the time when the right or liability of a third party accrues the verbal contract cannot be enforced is strongly sustained by authority, questions it on principle, on the ground "that the statute does not make the contract void, but only allows a defense to its enforcement, which defense is personal to the defendant and may be waived by him." It is to be noted, in this connection, that the original statute, and that of several of the states, unlike our own, do not declare the verbal contract void, but provide "that no such contract shall be allowed to be good" unless the statute is satisfied.

Order reversed, and a new trial granted.

MITCHELL, J.

I am of opinion that the evidence was conclusive that there was no acceptance and receipt of the goods by the plaintiff under the verbal contract between her and her son as required by the statute of frauds, and, therefore, instead of merely granting a new trial, we should order judgment for the defendant, notwithstanding the verdict.

CANTY, J.

I concur with Justice MITCHELL.

[2] G. S. 1894, § 4210.