[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 232 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 233 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 234 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 235 
Chelsea N. Howland sued Iron Fireman Manufacturing Company, a corporation, for breach of an alleged *Page 236 
oral exclusive dealership contract, and defendant filed a counterclaim.
The jury returned a verdict for plaintiff in the sum of $10,284.90 on his first cause of action and for $26,162 on the second cause of action and for defendant against plaintiff in the sum of $8,882.75 which was the amount of plaintiff's acknowledged indebtedness to defendant.
The Circuit Court, Multnomah County, Frank J. Lonergan, J., entered a net judgment on the net verdict for plaintiff for $27,564.15 and costs. Defendant's motion for judgment notwithstanding the verdict and in the alternative for new trial was denied, and defendant appealed.
The Supreme Court, Brand, J., reversed the judgment and held that the contract was within the statute of frauds and failure to submit to the jury the question whether delivery, acceptance and payment were exclusively referable to the contract on which plaintiff relied so as to take the contract of the statute constituted reversible error.
The defendant is a corporation engaged in the business of manufacturing automatic coal burners and automatic oil burners. Under date of 24 April 1944 plaintiff and defendant entered into an argeement in writing, under the terms of which plaintiff was appointed defendant's dealer in Multnomah County, Oregon, with the exclusive right to sell and deal in defendant's No. 4 and smaller sizes of defendant's automatic coal burners. Said written contract is set forth as an exhibit to the defendant's answer and was received in evidence without objection. After alleging *Page 237 
the business of the defendant corporation and the execution of the contract, the complaint alleges that at the time of the execution thereof, the No. 4 and smaller sizes of defendant's automatic coal burner constituted defendant's entire line of heating equipment available for sale within said territory. It is alleged that under the terms of the contract in accordance with the defendant's policy and requirements:
 "* * * Plaintiff was required to aggressively pursue, within his said territory, the merchandising of said home heating equipment, the employment of adequate facilities to survey the premises wherein such equipment would be installed, the installation of said equipment, to render adequate and satisfactory service to purchasers thereof and Plaintiff was also required to promote and energetically pursue the sales of such equipment in his said territory."
We shall refer to defendant's home heating equipment, to wit, No. 4 and smaller sizes of defendant's automatic coal burners, for brevity, as the "coal burners" or "stokers". The plaintiff alleges and the defendant denies that plaintiff continued to be the exclusive dealer in defendant's coal burners up to the 4th day of June, 1946. The plaintiff alleges that on or about 1 July 1945 the defendant commenced the active manufacture of oil burning equipment for home heating and "requested Plaintiff to act as its exclusive dealer in Multnomah County, Oregon, for the sale of its said oil burners to the end that Plaintiff would be in a position to sell to all customers in his territory such home heating equipment as such customers might require, either coal burners or oil burners", and that "Plaintiff thereupon accepted said agency and was at all times thereafter prepared to sell Defendant's *Page 238 
oil burners in his said territory of Multnomah County, Oregon."
The complaint further alleges:
 "That in the summer and fall of the year 1945, Defendant began to manufacture oil burners in sufficient quantities so that the same could be sold to customers and Defendant announced to all of its dealers selling Defendant's home heating equipment, and particularly to Plaintiff, two new additions to Defendant's line of automatic home heating equipment, to-wit: the Iron Fireman's Luminous Vortex Oil Burner, and the Iron Fireman's Standard Pressure Type Oil Burner. That said oil burners were competitive to Defendant's No. 4 and smaller size automatic coal burners and Defendant represented to its dealers, and particularly to the Plaintiff, that its said oil burners would be supplied to said dealers, including Plaintiff, * * * so that * * * Plaintiff, would be in a position to sell to the public either coal burners or oil burners, whichever was preferred by a prospective purchaser.", and that, "To induce Defendant's dealers to aggressively market and sell said oil burners, Defendant represented that the dealers holding exclusive coal burner franchises, including Plaintiff, would also be exclusive dealers for the sale of Defendant's oil burners in their respective territories and Defendant urged and solicited their said dealers, and particularly the Plaintiff, to employ their full efforts to obtain the maximum sales of oil burners."
The complaint further alleges that defendant represented to plaintiff "that he was and would continue to be Defendant's exclusive dealer for the sale of said oil burners in his said territory", that plaintiff believed the representations and in reliance thereon expended approximately $5,000 in employing and training *Page 239 
service men and salesmen, in increasing office facilities, securing warehouse space, the equipment and trucks, and that the defendant by its conduct treated the plaintiff as its exclusive dealer for oil burners. Paragraph VIII of the complaint is as follows:
 "That Plaintiff solicited as Defendant's exclusive dealer in Multnomah County, Oregon, oil burner customers and entered into contracts with such purchasers for the sale of Defendant's oil burners. Plaintiff thereupon placed orders with the Defendant for such oil burners to be furnished his said customers. That due to the shortage of oil burners upon the market and the great demand therefor, Plaintiff was in a position to take unlimited number of orders for Defendant's oil burners, but refrained from so doing and instead thereof counseled almost daily with Defendant as to the number of orders and sales of such oil burners which Plaintiff should accept and the number of oil burners which Defendant could and would supply to Plaintiff, and Plaintiff at all times accepted only such orders for oil burners as the Defendant promised and assured Plaintiff that the Defendant could and would supply to Plaintiff for his such customers within a reasonable time."
Complaint alleges that the plaintiff in reliance upon defendant's representations and promises "continued to accept orders and, as fast as oil burners were supplied by Defendant, to install the same until on or about the middle of January, 1946" and received deposits from customers and paid salesmen commissions. Paragraph X of the complaint is as follows:
 "That on or about the 15th day of January, 1946, the Defendant herein ceased to fill Plaintiff's orders for oil burners, although Defendant had on hand in Portland, Oregon, ready for sale and installation a large number of oil burners sufficient *Page 240 
in number to fill Plaintiff's orders and supply Plaintiff's customers, and said action on the part of the Defendant continued until on or about the 15th day of February, 1946, at which time Defendant notified Plaintiff that it would not deliver to Plaintiff the oil burners necessary to fill the orders that Plaintiff had taken from customers, all with the knowledge and acquiescence of the Defendant."
The complaint alleges that as a result plaintiff was compelled to cancel certain orders and refund deposits. Attached to the complaint is Exhibit A, an itemized list containing the data concerning 82 oil burners contracted by plaintiff to be sold to his customers, and which contracts he was required to cancel. It is alleged that the plaintiff lost profits which he would have made on said contract and thereby suffered damage in the sum of $9,926.78. It is further alleged that in an attempt to carry out his contracts with purchasers, the plaintiff fabricated twelve oil burners not included in Exhibit A and thereby incurred expense in the sum of $358.12 in excess of the price which he would have been required to pay under his dealer's contract.
For his second cause of action the plaintiff incorporates by reference the allegations of the first cause, except paragraph 8, quoted supra, and except the remaining paragraphs 9 to 15 which we have summarized immediately following the quoted text of paragraph 8, and he alleges that the defendant, between the 18th day of October, 1945 and the 4th day of June, 1946, in violation of plaintiff's rights as exclusive dealer, sold a large number of oil burners direct to purchasers without accounting to the plaintiff as to said sales. It is alleged that by reason of the direct sales by the defendant within the plaintiff's exclusive territory the plaintiff lost profits "that he would have *Page 241 
made had said oil burners been sold through plaintiff", and that plaintiff has been damaged thereby in the sum of $27,624.85. Plaintiff acknowledges indebtedness to the defendant on open account in the sum of $8,851.13 and prays for judgment in the sum of $9,926.78 plus $358.12 on the first cause of action and $27,624.85 on the second cause of action, less the $8,882.75 owing from plaintiff to defendant.
In its answer the defendant admits the execution of the written contract concerning coal burners but denies that plaintiff continued to be the exclusive dealer up to the 4th day of June, 1946. The defendant denies that it agreed to constitute the plaintiff its exclusive dealer for the sale of oil burners and alleges:
 "that it actively resumed the manufacture of oil burner equipment for home heating during the fall of 1945, and until on or about the 5th day of December, 1945, defendant permitted plaintiff to sell said equipment at retail in limited quantities to be supplied to plaintiff in accordance with defendant's announced plan and policy of equitably distributing its limited supply of oil burners among its numerous retail outlets."
Defendant denies that it was to furnish oil burners so that plaintiff could sell to all customers such home heating equipment as they might require. The answer alleges that after commencing the manufacture of oil burners in 1945:
 "it * * * announced to its automatic coal burner dealers, including plaintiff, two new additions to defendant's line of automatic home heating equipment, to-wit, the Iron Fireman's Luminous Vortex Oil Burner and the Iron Fireman's Standard Pressure Type Oil Burner. Defendant alleges that it informed plaintiff that it would accept initial orders for this equipment from its automatic coal burner *Page 242 
dealers pending the issuance by it of individual dealer franchises for the sale of its oil burners, and defendant informed plaintiff that it would distribute its limited supply of oil burners among its coal burner dealers and other retail outlets in a fair and equitable manner."
Answering the plaintiff's allegation that defendant had recognized the exclusive character of the agreement for the sale of oil burners, the defendant admits that it did:
 "in some instances refer inquiries from prospective customers concerning defendant's oil burners to plaintiff. Defendant alleges that it did so at times when defendant's own retail staff was unable to handle such inquiries efficiently because of the large volume of requests and inquiries concerning the said oil burners which were addressed to defendant."
Defendant "admits that plaintiff solicited, obtained and placed with defendant a large number of orders for defendant's oil burners to be furnished to plaintiff's customers", but, "alleges that it accepted as many of plaintiff's orders as its limited supply of oil burners would permit it to accept, in accordance with its policy of equitable distribution among its retail outlets in all areas." Defendant alleges that in so far as plaintiff may have continued to accept orders, it was done upon plaintiff's own responsibility, and:
 "without promises or assurances from defendant that it could or would supply plaintiff with sufficient burners to take care of such orders, and contrary to defendant's express representations and statements to plaintiff that it could not supply even in large part the prevailing demand for oil burners in Multnomah County or any other of its retail areas." *Page 243 
Defendant alleges that it ceased to fill plaintiff's orders for oil burners on or about the 5th day of December, 1945, and was at that time forced to discontinue the manufacture thereof "because of government restrictions, material shortages and other conditions over which it had no control." It alleges further that if on that date the defendant did have on hand a supply of oil burners sufficient in number to fill plaintiff's orders "all of said burners were committed in accordance with defendant's plan of equitable distribution to other retailers" and that defendant did, nevertheless, offer to supply to plaintiff twenty-three oil burners in excess of plaintiff's allotment. The other allegations of the first cause of action are denied.
As its answer to the second cause of action the defendant reiterates its answer to the first cause, alleging that it has at all times maintained its own retail department through which it has sold all of its products, except the coal burners, as such equipment became available, and never issued any exclusive dealership to the plaintiff for its oil burners. It alleges that the plaintiff is indebted to the defendant in the sum of $8,882.75 and prays for judgment in that amount. The reply is a general denial. The verdict was as heretofore stated. The full amount prayed for upon the first cause of action was awarded by the verdict of the jury. Upon the second cause of action the verdict was $1,462.85 less than the amount prayed for.
The denial of defendant's motion for a directed verdict as to each cause of action is assigned as error. The plaintiff contends that an oral contract was made between the defendant and himself, under which he was to have an exclusive franchise for the sale of oil *Page 244 
burners in Multnomah County. He contends that the agreement was reached during the latter part of the summer of 1945, and in July or August, in oral conversation between himself and Mayne Read, district sales manager of the defendant company. The making of such an agreement was denied by the defendant and by Read as a witness, but counsel for the defendant properly concedes that the verdict of the jury requires that the plaintiff's version be accepted as true for the purpose of passing upon the ruling on the motion for directed verdict, and for that purpose only. While conceding that the testimony of the plaintiff must be accepted as against opposing testimony, the defendant nevertheless contends that the plaintiff's evidence is not sufficient to establish a valid contract. It asserts, in substance, that there is no evidence of acceptance of the offer made by Read, that the testimony of the plaintiff shows only preliminary negotiations looking toward a contract, but not constituting one, and that the purported agreement shown by the plaintiff's testimony was indefinite and uncertain and therefore invalid. Defendant also claims that the purported agreement was void for lack of mutuality and that Read was without actual or apparent authority to make any such agreement. Defendant contends that there was no ratification of Read's acts and that the agreement as testified to by plaintiff, being oral, is void under the statute of frauds.
We will first take note of the relationship of the parties as it was prior to the agreement concerning oil burners. For many years the defendant had been engaged in the manufacture and sale of coal burners or stokers. The plaintiff had been employed by the Pacific Coast Coal Company which then held a franchise from the defendant company whereby the coal *Page 245 
company became the dealer for defendant's coal stokers. Early in January, 1944 he was informed by the coal company that it was about to surrender the stoker franchise and during that month the plaintiff opened negotiations with the defendant for the purpose of securing the stoker franchise for himself. In the negotiations which were initiated by the plaintiff in January, 1944, he first made inquiry at the defendant's Portland office and was referred by it to Mayne Read as the "proper man to talk to". He then talked with Mr. Sammons who was the Vice President of the company, and thereafter with Mr. Read. In plaintiff's brief Read is incorrectly described as the Western Division Manager of the company. His proper title was District Sales Manager. The verbal agreement for the stoker franchise was reached in conversation between the plaintiff and Read. It was agreed that a written franchise would follow. The evidence does not disclose the detailed terms of the oral agreement under which the plaintiff operated in the sale of stokers prior to the effective date of the written franchise. It does appear that his dealership was to be exclusive from the date of the termination of the coal company's franchise. Even before the termination of his employment with the coal company, and apparently before the surrender of the stoker franchise by the coal company, the plaintiff began seeking orders for stokers for future delivery upon his own account. This activity began in February and by the last of March, 1944 he had secured nearly $3,000 worth of orders. We quote from plaintiff's testimony concerning the stoker franchise:
 "Q At that time you knew, of course, your franchise was to become effective on April 25th?
"A My franchise had already become effective.
"Q Your written franchise? *Page 246 
 "A No, no, that was a verbal franchise, too. Mayne Read told me that that franchise would be forthcoming.
 "Q Didn't he tell you it would become effective April 25th?
"A He might have ____
 "Q You, of course, could not have had an exclusive as long as there was an exclusive outstanding with the Pacific Coast Coal Company?
 "A Surely, and he assured me that mine would take effect when their's ended.
 "Q So there had to be a cut off, when one ended and the other started?
 "A I think we all understood that, whether it was said or not."
Thereafter he continued operations as a stoker dealer under a verbal agreement and prior to the receipt of any written franchise. He received a written franchise dated 25 April 1944. The plaintiff testified that he received the written stoker franchise in June of 1944 and signed and returned it as soon as he got it. Whatever may have been the oral agreement between the parties prior to 25 April 1944, it is clear that their relations were controlled by the written agreement after its execution. The franchise of 25 April 1944 constituted the plaintiff the exclusive dealer within Multnomah County for the sale of coal stokers. The written franchise provided:
"* * *
 "15. OTHER STIPULATIONS AND AGREEMENTS: Anything herein to the contrary notwithstanding, it is specifically understood and agreed that the tenure of the franchise herein granted is on a year-to-year basis. It is understood that the first twelve months following the date *Page 247 
of this agreement are to serve as a proving period, and that if this agreement is satisfactory to both of the parties hereto it may then be renewed for a further period of time which is to be agreed upon at that time."
The defendant company commenced the manufacture of oil burners in 1939 and unlike the case of the coal stokers, the oil burners were sold and distributed either through any responsible dealer or through a licensed Iron Fireman dealer, or through the retail department of the company.
The defendant had about 7500 stoker dealers operating upon exclusive franchises. In 1943 or 1944 the defendant offered oil burners to their stoker dealers on a nonexclusive basis. Aside from the alleged contract with the plaintiff, no exclusive franchises were issued on oil burners until late in 1946. During the war, production was drastically curtailed by the restrictions imposed by the War Production Board, and manufacture of oil burners was suspended except for a small number authorized by government priority. Upon termination of the war the defendant resumed production, but the first oil burners were not completed until September, 1945. The written stoker franchise of 25 April 1944 conferred no rights concerning oil burners. The controversy here relates to the violation of the alleged oral contract constituting the plaintiff a dealer in defendant's oil burners only. It was the position of the defendant at the trial that the plaintiff was authorized to act as a dealer in oil burners, but only upon a nonexclusive basis.
We will now set forth the substance of the testimony for the plaintiff concerning the alleged agreement which for our present purpose will be treated as true. *Page 248 
There was a conversation between plaintiff and Mr. Read at the office of the plaintiff, and in the latter part of the summer of 1945. Read told the plaintiff that he was sure that two models of oil burners would be in production and that plaintiff was to be the dealer for the company. Plaintiff told Read that he wished to be their sales agent, but added that he did not want the agency unless it was to be exclusive. Plaintiff told Read that he disapproved of the company's policy of selling at retail in its own store in competition with its dealers. Read was "inclined to take the plant's view", but Read said, "It would be handled by dealers on exclusive basis." The conversation referred to two models, the Luminous Vortex Oil Burner and the Standard Pressure Type Oil Burner. Read told plaintiff that the price to plaintiff was definitely fixed at $85 on one type and $110 on the other. Plaintiff said he was willing to pay that price for them. Plaintiff told Read that he could get orders for as many burners as he could secure, but Read "warned" him "that at first the production of burners would be rather slow", and that plaintiff, as well as other dealers, would have to be satisfied that the manufacturing would take time, but Read said that very quickly they would be into complete production and that then the plaintiff could have all that was needed in the territory. Plaintiff told Read that if he received the agency he had the money to handle it and that he would get a first-class suitable place. Plaintiff explained to Read investments which he would have to make and that he did not want to put the "money into an agency unless it was exclusive", to which Read replied, "Boy, if that is what you are going to do, you will get the exclusive." Read said that the plaintiff should have the *Page 249 
territory of Multnomah County and he would see about giving him Vancouver, Washington, also. We quote:
 "Q Was anything said at that time by Mr. Read as to whether or not, if this salesman agency was given to you, that the factory would make sales direct to customers?
 "A Aside from saying they were not going to handle it that way any more and would put it in the hands of a dealer. He agreed with me that a high-grade piece of goods could not be put out and cross-fired between the dealer and the factory, and so forth.
"Q So you discussed that question?
"A We certainly did."
Read said that he disapproved of the practice of factory selling direct. Again we quote:
 "A I asked him if the contract would be similar to the stoker contract in relation to time, and he said it would be similar to that contract, and that is the only discussion we had in reference to time. That satisfied me, because the contract was on a year's basis and could be cancelled in thirty days.
 "Q Was anything said about its being reduced to writing?
 "A Yes, I asked him for the franchise, and he said they were not made, that they had to come from Cleveland, and when they came I would get one."
At the conference Read told the plaintiff that the machines would be available and that plaintiff would get them "right shortly". In answer to an inquiry as to the conclusion of the conference with Read, plaintiff said:
 "* * * Mayne Read was a little rankled at what I had said at the office and the way I criticized the company, and he was kind of put out about that, and he was taking the company's part. Still, when we left our office, he was in a good mood and we *Page 250 
went up and had lunch and we discussed the matter further, and I told him what moves I was going to make and what plans I had, and he said, `Well, boy, you will get the franchise. I will get the franchise for you'."
The foregoing summary fairly states the plaintiff's version of the agreement concerning the exclusive character of the agency, the types of burner involved, the prices to the plaintiff, the duration of the agreement, the territory involved and the quantity to be supplied so far as that was discussed in the initial conversation between the plaintiff and Read. The plaintiff contends that there were eight other obligations assumed by him. We will list them as set forth in plaintiff's brief and refer to the evidence offered in support of each. From the brief we quote:
"(d) Obligations of Respondent —
"(1) To obtain warehouse space.
"(2) To acquire trucks.
"(3) To set up a display room."
Plaintiff testified: "* * * I told him if I took the agency that I would have to get warehouse space and trucks, and put in a good display room, * * *";
"(4) To employ first class salesmen.
"(5) To hire installation crew."
Plaintiff testified: "I told him we would put on good first-class salesmen, and I told him we would get a good crew of men behind it and put the jobs in right";
 "(6) To handle Iron Fireman products only and exclusively."
Plaintiff testified: "We were both agreed that we were to handle only the Iron Fireman equipment throughout and nothing else. * * *";
 "(7) To spend time and effort exclusively in sale of Appellant's equipment." *Page 251 
Plaintiff testified: "* * * I told him if I were to get the exclusive agency, that we would spend all our time and put forth all our effort in selling their equipment.";
 "(8) To service for a period of one year (including 90-day free service) all oil burners sold and installed in Multnomah County, Ore."
Plaintiff testified that under his arrangement with Mr. Read he was required to service all Iron Fireman burners and stokers, and Mr. Elmer Howard, Manager of the Sales Order Department of the defendant testified that any dealer was responsible for service on all installations which the dealer made. We quote further from plaintiff's testimony:
 "Q After you concluded this talk with Mr. Read, did you have any hesitancy in going ahead and starting sales up?
 "A I did not. This talk was the same as our stoker talk. I tried to tie Mr. Read down in our talks and I never got him to say he would give me the exclusive dealership, but this was the only time we talked this out over a long period of time, and we had something to go on, and I thought I was in good position and I felt we had the exclusive, and he said I had the exclusive deal on their sales, and from then out, I didn't have a bit of worry."
The wife of the plaintiff testified that about the middle of September, and before the plaintiff bought the trucks, she heard Mr. Read state to the plaintiff, "I told you, you have the exclusive in your territory, you are the one to get the burners." The plaintiff testified:
 "Q Now, the conversation you are talking about is the only one you discussed this exclusive dealership in the oil burners? *Page 252 
"A Yes, that was the morning he came to my office."
It is the testimony concerning this conversation on which plaintiff bases his claim to an oral dealership contract. We quote the following statement from his brief:
 "As a result of and by that conversation, Appellant, acting through Read, and Respondent, entered into a verbal agreement and contract which is the basis of Respondent's causes of action. * * *"
We believe we have fairly set forth in substance all of the testimony favorable to the plaintiff concerning the alleged agreement made by that conversation. There is other evidence of subsequent conduct of the parties on which the plaintiff relies as tending to show recognition of the oral contract, but not the making of it. Concerning the duration of the agreement, the only allegation of the complaint is that the plaintiff "was and would continue to be Defendant's exclusive dealer * * *." Plaintiff's only testimony upon the point is that in relation to time, the contract "would be similar" to the stoker contract. We have already quoted the controlling provision of the stoker franchise.
The plaintiff did in fact buy two new trucks at a cost of approximately $2,000 and tools at a cost of about $400. He enlarged his office, purchased office furniture and equipment, and partitioned a warehouse, all in alleged performance of his contract, and he hired and trained an installation crew at further expense to himself. He also hired a salesman on 27 August 1945, and moved into a new location in December, 1945. *Page 253 
The plaintiff introduced in evidence a letter of 18 October 1945 signed by C.T. Burg, Vice President in Charge of Sales. That letter, addressed to all Iron Fireman dealers, announces two new oil burners now being manufactured. We quote:
 "We are now beginning the assembly of both the Standard and Luminous Vortex models. Naturally, during the next few months the volume produced will be somewhat limited because of the present difficulty during the reconversion period in securing certain materials. But as materials become more abundant we will rapidly step up our production to the point where all dealers can immediately secure as many oil burners as they can sell. In the meanwhile we will distribute the limited supply available among our dealers in a fair and equitable manner.
 "We will now accept initial orders for both models of Iron Fireman oil burners, and we suggest that you place an order at once. * * *
 "Pending the issuance of individual dealer franchises, covering the sale of Iron Fireman oil burners, we will supply our oil burners to Iron Fireman dealers holding stoker franchises, as these burners become available."
Plaintiff asserts that he had already consummated his verbal contract for an exclusive dealership before this letter was received, but he also asserts in his brief that "respondent therefore treated this letter as a confirmation of his oral agreement" and that Read had already assured the plaintiff that a written franchise would be delivered to him from the Cleveland office. Referring to the letter of October 18, 1945 which was written by Mr. Burg, and to plaintiff's deposition concerning it, plaintiff was asked, "Now, did you say that you treated that as a franchise?" "A Well most *Page 254 
certainly. * * *" Witness continued: "A Yes, to this extent. We had received a verbal franchise already, and we were already in agreement on that and we acted on that, and this confirmed certain terms of that agreement, and I would say I was operating under an oral-contract, that had its limitations, and its limitations were these * * *". Unfortunately the plaintiff did not finish his sentence, but it appears clear that the limitations to which he referred were those set forth in the letter of October 18. After colloquy between court and counsel, counsel for the plaintiff said: "In the deposition, the witness said (reading): `The Witness: And this only amplified previous verbal information along that line."' A price list for the two types of oil burners was enclosed in the letter of October 18, 1945. The prices to plaintiff were subsequently lowered from $85 and $110 on the two types of burner to $81 and $102 respectively. The evidence of plaintiff establishes that he was taking orders for oil burners prior to the time of the alleged exclusive agreement with Read, and at a time as to which he makes no claim to any exclusive right. Speaking of oil burners, plaintiff said, "We were to get our first deliveries along in the first of February, and we did get them." Again we quote plaintiff's testimony:
 "Q You recall in this deposition that you were asked the question whether your conversation with Mr. Read was before or after you took your first burner order, do you recall that?
"A Yes, I do.
"Q What was your answer then?
 "A I took our orders before I talked with Read on that particular occasion.
 "Q Then you did have a backlog of orders at the time you talked to Mr. Read? *Page 255 
 "A No, not what you would call a backlog in business. We had a few orders.
"Q A few?
"A Yes.
"Q How many did you have?
 "A I don't believe I could answer that, but, to my best recollection, we did not have the numbers we had later on when operating in full force.
"Q When had you taken these orders listed?
 "A They were taken there along in the summer of 1945. It was common talk that they had planned making burners when the war restrictions were over. We had lots of inquiries for them and we took a few, feeling assured we would get some. Most of them were taken on the basis of being installed when received.
 "Q Had you taken any before the spring or summer of 1945?
"A No, we had not.
 "Q You said in your deposition you took your first one in June, is that according to your best recollection?
 "A Yes, I would say that would be a reasonable time to place on it."
The deliveries prior to the agreement with Read were made like other deliveries to the holders of stoker franchises on a nonexclusive basis.
Plaintiff introduced in evidence an advertisement published in the telephone directory of March, 1945, advertising oil burners and coal stokers, and continuing:
"Where to Buy them
Oil Burners
 HOWLAND C N CO 1 S.W. 6th ________ BEacon-5139 IRON FIREMAN MFG CO 4784 S.E. 17th __________________ EAst-2121" *Page 256 
This advertisement was paid for by the plaintiff and defendant jointly. The advertisement was published prior to the date of the alleged exclusive agreement and clearly indicates that they could be bought either from the plaintiff or from the defendant. The plaintiff submitted an identical advertisement in December, 1945, for inclusion in the 1946 telephone book.
The specified grounds of defendant's motion for a directed verdict are:
 Failure to produce any evidence of the making of a contract or contracts, "such as are relied upon in the complaint."
 Failure to prove that the alleged contract or contracts were entered into by anyone authorized to represent the defendant or to prove ratification.
 That the contract is within the statute of frauds and there is no evidence taking the case out of the statute.
 That there is no evidence sufficiently definite to constitute a binding contract.
 That there is no evidence of a breach of any such contracts, since it appears that "any such contracts were subject to the oil burners being available and were subject to an allocation system which was to be administered by the defendant, and there is no evidence that any such burners were available for delivery to the defendant under that state of facts."
 And that there is no evidence of any damages incurred as a result of any alleged breach of contract.
We will first consider the defendant's contention that there was no substantial evidence showing that *Page 257 
the contract relied upon was made by anyone whose action bound the defendant or that it was ratified by the defendant. Upon this issue we think plaintiff has the better of the argument. In considering this question we shall assume, without deciding, that a sufficiently definite oral agreement was made between Read and the plaintiff and was not within the statute of frauds.
Mr. Read was the district sales manager in an area covering eleven western states including Oregon and was in charge of sales by the western division. His job was to set up dealer organizations and to "line up dealers and arrange for their franchises". The evidence discloses that there were many dealers in the western division. Mr. Read testified that it was understood that plaintiff could sell oil burners, and, he added "it is quite probable that I told him to go ahead and sell oil burners, that is, if he could get them, * * *". The arrangements whereby the plaintiff acquired the stoker franchise were made in conversation with Read, and under the agreement then made the plaintiff acted as distributor under some form of working agreement for the sale of stokers for a considerable period prior to the receipt of his written franchise. No question was raised by the defendant as to the plaintiff's right to act as the defendant's dealer for the sale of stokers prior to the written agreement providing therefor. We think the course of dealing between the parties, coupled with the evidence concerning the scope of Read's duties, constituted some evidence of his apparent, if not actual authority. His dealings in relation to the stoker contract were known to and approved by defendant company. Pursuant to a verbal agreement with Read, with whom he had negotiated and carried out a previous verbal *Page 258 
agreement pending the execution of a written franchise, the plaintiff received some kind of a contract whereby he became a dealer in defendant's oil burners. On 21 March 1946 Read wrote to the defendant's home office in Cleveland as follows: "My records indicate that Howland has been operating on more or less of an implied dealership basis * * *", and Read suggested that his "working arrangement with us be cancelled as of (I suggest) 30 days from date." There is no evidence that Read was empowered to execute a written franchise, but we think there was some evidence of his actual and apparent authority to negotiate a working agreement pending a written franchise. Although grave questions arise concerning the terms of the contract and its performance, the fact remains that some contract was made between plaintiff and defendant through Read and that the parties dealt with each other in accordance with their understanding that contractual relations had been established. We find substantial evidence that Read had authority, real and apparent, to authorize the plaintiff to act as a distributor pending action by his superiors in issuing a written franchise. The following authorities support our conclusion: Hillyard v. Hewitt, 61 Or. 58, 120 P. 750; Raev. Heilig Theatre Co., 94 Or. 408, 185 P. 909; Carstens PackingCo. v. Gross, 131 Or. 580, 283 P. 20; Moll v. Roth Co., 77 Or. 593, 152 P. 235; Calvert v. Idaho Stage Co., 25 Or. 412,36 P. 24; Aerne v. Gostlow, 60 Or. 113, 118 P. 277; Cranston v. WestCoast Life Ins. Co., 72 Or. 116, 142 P. 762; 13 Am. Jur. 889, Corporations, §§ 915, 916; Barber v. Stromberg-Carlson TelephoneMfg. Co., 81 Neb. 517, 116 N.W. 157. We may add at this point that there was not only evidence of a working dealership agreement which was negotiated by Read and the plaintiff but also that there is *Page 259 
some substantial evidence of certain of the terms of that agreement, specifically that it was an exclusive dealership and that its duration was for the period of one year.
We will next consider whether the alleged oral agreement, as testified to by the plaintiff, is enforceable under the statute of frauds. For the purpose of this discussion, we will assume that the contract is otherwise definite and enforceable. In his brief the plaintiff contends that the contract "is not a sales contract, but rather an agency contract". Secondly, the plaintiff contends that:
 "* * * even if a dealership contract be considered as a sales contract, Appellant's deliveries of oil burners between September and December, 1945, and its subsequent delivery on February 22, 1946, of eight oil burners, and the receipt of payments therefor upon the oil burners delivered between September and December, 1945, constitute such part performance as to take the case out of the Statute of Frauds."
Plaintiff also contends that the statute of frauds was waived by the defendant when it set forth in its answer a counter claim for money owing on account of goods, wares and merchandise furnished to the plaintiff, of the agreed value of $8,882.75. It will be observed that in contending that the contract should be deemed an agency rather than a sales contract, the plaintiff does not deny that oil burners were sold by the defendant and purchased by the plaintiff, who took title thereto. On the contrary, counsel for the plaintiff, in his argument before this court, stated:
 "We maintain the contract was both an agency contract and a sales contract. We paid for the burners, but in many respects we were acting as *Page 260 
agent for the Iron Fireman Manufacturing Company, notably filling their guarantee, calling on people that they directed that we call upon."
In taking this position, counsel correctly interpreted the evidence in so far as sale and purchase is concerned. Whatever may be said concerning the existence of an alleged agency, the entire conduct of the parties conclusively establishes that the defendant sold the oil burners to the plaintiff, that the plaintiff purchased and paid for them, and then as vendor sold them to his own customers. The exhibit which is attached to the complaint for the purpose of showing the profit which plaintiff would have made on 82 burners for which he had received orders, shows the price at which he would have purchased and the price at which he would have sold to his clients, and the profit which he would have made. The plaintiff testified in connection with the alleged oral agreement that Read:
 "A * * * said the price was definitely fixed at $85.00 on the gun type model, with a differential of $25.00 on the Vortex model.
"Q That would be $85.00 and $110.00?
"A $110.00 is what they came to, yes.
 "Q What did you say to him, whether or not you would handle them on that kind of price?
 "A Well, I did not consider that price too far out of the way in view of the market which was present at that time. I said I was willing to pay that price for them."
Other evidence is to the same effect.
By motion for nonsuit and for directed verdict, and by requested instructions, the defendant presented the issue of the statute of frauds. The applicable statute *Page 261 
which is a part of the uniform sales act reads as follows:
 "(1) A contract to sell or a sale of any goods or choses in action exceeding the value of $50 shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf.
 "(2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time or may not at the time of such contract or sale be actually made, procured or provided, or fit or ready for delivery, or some act may be requisite for making or completing thereof, or rendering the same fit for delivery; but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply.
 "(3) There is an acceptance of goods within the meaning of this section when the buyer, either before or after delivery of the goods, expresses by words or conduct his assent to becoming the owner of those specific goods." O.C.L.A., § 71-104.
Our first question is whether a contract of purchase and sale which also includes other agreements establishing a relation of, or similar to, agency, is within the statute of frauds. The rule is set forth by Williston as follows:
 "A contract though within the Statute as to some portion of the performance promised by the defendant, may not be as to the remainder. Such a contract is nevertheless unenforceable in any part, since the contract is an entirety, and the fact *Page 262 
that part cannot be enforced involves the unenforceability of the whole. Even though the contract is divisible in its nature and a divisible portion of performance on both sides may not be within the Statute, the same result must be reached. As a divisible contract is not several contracts but a single agreement, neither party can be required to perform part unless the whole is enforceable. * * *" 2 Williston on Contracts, § 532.
From the Restatement of the Law of Contracts, we read the following:
 "Where a contract consists of one or more promises unenforceable because of the Statute, and one or more promises which are not within it, the latter are unenforceable so long as the former remain unperformed or unenforceable but no longer; except that where performance of the only promise or promises within the Statute is exclusively beneficial to one party, that party, by agreeing to forego any claim to such performance may render the remainder of the contract enforceable." Restatement of the Law, Contracts, Vol. I, § 221.
In Rugh v. Soleim, 92 Or. 329, 180 P. 930, the plaintiff sued upon an oral contract to recover a commission for negotiating a contract for the sale or trade of defendant's land and personal property. At the close of the testimony for the plaintiff, the defendant rested and moved for a directed verdict upon the ground that there was no evidence sustaining the plaintiff's claim within the statute of frauds. The court said: "The directed verdict was a proper solution of the issue." We quote:
 "It is claimed, however, that inasmuch as they allege that some personal property was to be included in the deal as well as their services for drawing up the contract and helping to close the deal, the plaintiffs are entitled to recover at least *Page 263 
for the services other than acting as a broker to secure a purchaser for real property. The contract stated, however, is not a severable one. It is for a lump sum without reference to the separate value of any particular item and hence, as it includes services within the statute of frauds, the whole stipulation is void and cannot be enforced as such, the action being plainly upon the contract as alleged and not for the quantum meruit. * * * It would be an evasion of the statute if a real estate broker assuming to act under oral appointment to negotiate a sale of land, should be allowed to tack his claim for that service to another demand for drawing a deed and make the latter the device by which he could recover on an agreement which the law says is void unless it is embodied in a writing containing certain prescribed terms. * * *"
Many cases are cited in support.
The case of Pettigrove v. Corvallis Lumber Manufacturing Co.,143 Or. 33, 21 P.2d 198 is cited by Williston in support of the text quoted supra. This also was an action to recover brokerage commissions under an oral agency contract for the sale of real and personal property. The plaintiff conceded and the court held that there could be no recovery unless the contract was divisible, since it included both real and personal property. Upon proof of the oral contract, and that it included both real and personal property, the defendants challenged the sufficiency of the evidence by motion for a nonsuit which was granted. The plaintiff appealed and this court affirmed. It was held that the contract was not severable since the oral contract contained no apportionment of the price between real and personal property. In support of the decision the court cited Jackson v. Stearns,58 Or. 57, 113 P. 30; Sorenson v. Smith, 65 Or. 78, 129 P. 757, *Page 264 
131 P. 1022; Slotboom v. Simpson Lumber Co., 67 Or. 516,135 P. 889, 136 P. 641; Rugh v. Soleim, supra, and Williston on Contracts, Section 532. See also Van Orsdol v. Hutchcroft,83 Or. 567, 163 P. 978.
From a note by the editors of A.L.R. we quote the following:
 "The general rule universally approved by the courts is that, if a parol contract is entire and indivisible, and part of it is within the statute, the whole contract is unenforceable, although part of it is not covered by the statute." Anno., 71 A.L.R. 480.
The text is supported by decisions from twenty four states of the union as well as by federal and English authorities. The reason behind the rule applies with equal force to all types of contract which contain provisions within the statute of frauds. Accordingly, where the contract is indivisible and contains provisions within the statute of frauds, together with other provisions which are not controlled by the statute, the contract has been held unenforceable in the following cases: (1) Contracts for the sale of real and personal property; (2) contracts to devise real and personal property; (3) contracts in part relating to an interest in land; (4) contracts in part not to be performed within one year; (5) contracts in part in consideration of marriage; (6) contracts in part to answer for the debt of another; (7) contracts for commissions for the sale of real and personal property; (8) contracts in part for the sale of personal property but containing stipulations not within the statute. See cases cited in 71 A.L.R. pp. 480 to 495 and cases cited in support of the following text:
 "A contract for the sale of a chattel is none the less within the statute because there is incorporated *Page 265 
in the contract other stipulations which are not within the statute, and if the contract is entire, the whole is brought within the operation of the statute." 27 C.J. Frauds, Statute of, § 404, p. 320. In C.J.S. the rule is stated as follows:
 "In order for the statute of frauds to apply, the transaction or agreement must constitute a sale or contract to sell; but, if the contract is one to sell goods, the fact that it also requires the parties to do something else does not take it out of the statute. * * *
"* * *
 "An agency contract as such is not within the statute of frauds, but, where the agreement also provides for the purchase of goods from the principal by the agent, such provision is within the statute. * * *" 37 C.J.S., Frauds, Statute of, § 141, p. 624.
In Cassidy v. Kraft-Phenix Cheese Corporation, 285 Mich. 426,280 N.W. 814, the plaintiff sued upon an alleged oral contract whereby the defendant agreed to grant to plaintiff the exclusive manufacturing and selling rights within a specified territory, of a product known as O-Ke-Doke. The contract was for a specified period of time, one provision of which required the plaintiff to purchase from the defendant a minimum of 5,000 pounds of cheese per month. The cheese was used in the manufacture of the product. Plaintiff alleged that he agreed to purchase the cheese from the defendant, to establish a manufacturing plant and promote the sale of the product, and that he expended substantial sums of money in preparation.
 "Appellant asserts that the order of the circuit judge sustaining in part defendant's motion to dismiss was erroneous because the contract was in fact one by defendant for the employment of plaintiff in the nature of an agency, and therefore not within *Page 266 
the statute of frauds. We think it is clear this position cannot be sustained. This contract provided for a purchase by plaintiff from defendant of merchandise very much in excess of the amount which rendered the contract unenforceable under the statute of frauds. The contract was wholly executory, and its interrelated provisions must stand or fall together. The noted provisions of the contract are not severable. If one is invalid the contract is unenforceable. Thorbahn v. Walkers Estate, 269 Mich. 586, 257 N.W. 892. Plaintiff is bound by the allegations in his declaration wherein it is stated `plaintiff was obligated to purchase of the defendant a minimum of 5,000 pounds of cheese per month' at 36 cents per pound. This provision was clearly within the statute of frauds. The holding of the circuit judge that as a matter of law the alleged oral contract was unenforceable and therefore plaintiff could not recover for its breach must be sustained.
 "In arriving at the above conclusion we are mindful of plaintiff's contention that the alleged oral contract has been partially performed by plaintiff and, therefore, should be held valid. Here again plaintiff's position is not tenable because the declaration, fairly construed, discloses merely that plaintiff did some things which were preliminary to the performance or execution of the contract, not that he did them in performance of the contract. * * *" Cassidy v. Kraft-Phenix Cheese Corporation, supra.
See also Dr. Miles Medical Co. v. John D. Park Sons Co.,220 U.S. 373.
Plaintiff seeks to distinguish the Cassidy case, and also criticizes it as incorrect, but we think it directly in point. The essential feature of the case is that there was an obligation to purchase goods in quantities which brought the case within the statute of frauds, *Page 267 
that it involved obligations of a dealer in the nature of agency and that the contract was indivisible.
In plaintiff's brief, and notwithstanding the statement made before this court, plaintiff appears to take the position that the contract must be either one of sale or of agency, and cannot be both. If we were compelled to classify the contract as one or the other, we should not hesitate to hold that the contract was one of sale. Concerning cases in which uncertainty arises, as to whether contracts should be construed as sales or agencies, we quote the following from Mechem on Agency:
 "These doubtful cases are to be determined, not by the name which the parties have seen fit to apply to their contract but by its true nature and effect. The essence of sale is the transfer of the title to the goods for a price paid or to be paid. Such a transfer puts the transferee, who has obtained the goods to sell again, in the attitude of one who is selling his own goods, and makes him liable to the person from whom he received them as a debtor for the price to be paid and not liable as an agent for the proceeds of the resale. The essence of agency to sell is the delivery of the goods to a person who is to sell them, not as his own property but as the property of the principal, who remains the owner of the goods and who therefore has the right to control the sale, to fix the price and terms, to recall the goods, and to demand and receive their proceeds when sold, less the agent's commission, but who has no right to a price for them before sale or unless sold by the agent." 1 Mechem on Agency, Second Edition, § 48.
In Heywood v. Doernbecher Mfg. Co., 48 Or. 359, 86 P. 357, 87 P. 530, the plaintiff, by written contract secured from the defendant, a manufacturer of furniture, *Page 268 
the exclusive right for a specified period, to sell the defendant's products within a specified territory. The plaintiff agreed to buy all of the products of the defendant. Prices were specified. The opinion of this court sets forth only a small portion of the written contract. Unfortunately, a search of the records discloses that the original pleadings, abstract, and briefs, as well as the copies thereof for our library, are all missing. However, since the contract provided that the defendant was to sell its entire product to the plaintiff, we must certainly conclude that the plaintiff assumed some obligation of diligence in marketing the product. The court said:
 "An examination of the contract referred to convinces us that it was the intention of the parties that the absolute property in the furniture was to be transferred from the defendant by the delivery of the goods to and the acceptance thereof by the plaintiff, which was to pay for and keep them thereby creating, as the lower court properly held, a sale and not an agency: 24 Am. Eng. Enc. Law (2 ed.), 1027. Because the defendant stipulated to sell the entire manufactured products to the plaintiff, which was designated in the schedule of furniture and the list of prices issued by the defendant as its sole agent in the territory mentioned, did not change the character of the transaction. Thus, a contract by the manufacturers of corn cutters appointing a person as general western agent for the exclusive sale of the machine and providing for the payment of a certain amount for each, subject to a discount for cash, was held to be a contract of sale and not of agency: Alpha Checkrower Co. v. Bradley, 105 Iowa, 537
(75 N.W. 369). To the same effect see Granite Roofing Co. v. Casler, 82 Mich. 466 (46 N.W. 728); Mack v. Drummond Tobacco Co. 48 Neb. 397 (67 N.W. 174, 58 Am. St. Rep. 691)." *Page 269 
In Williams v. International Harvester Co. et al., 172 Or. 270, 141 P.2d 837, plaintiff sued automobile dealers and the Harvester Company for damages for wrongful deprivation of the use of a truck. The dealers were found liable and the plaintiff sought to hold the Harvester Company on the theory that the dealers were the agents of the company. The court said:
 "* * * The amended complaint alleges that the defendants Amundson Baur were agents of International, but no agency was established by the proof. It may be gathered from the record that International is a manufacturer of automobile trucks and that Amundson Baur are dealers who purchase such trucks and sell them at retail. The order which plaintiff gave for the truck here in question was directed to Amundson Baur, and, so far as anything in the evidence discloses, they made the sale to Mrs. Williams on their own behalf and not as agents for International. Amundson Baur bought the truck from the latter defendant, assigned to it Mrs. Williams' note and chattel mortgage to secure payment, and, when Mrs. Williams paid them, they in turn paid International. The relationship was that of seller and buyer, not that of principal and agent."
In Stratton Terstegge Co. v. Stiglitz Furnace Co., 258 Ky. 678, 81 S.W.2d 1, cited by the plaintiff, the issue was presented as to whether the plaintiff had acquired certain rights as seller or as agent. The court said:
 "It is true there was a straight-out sale and purchase of the furnaces and the seller exercised no dominion over the resale price or otherwise controlled their disposition. But the contracts annually repeated that Stratton Terstegge Company was the sole agent of the manufacturer and exclusive dealer in the furnaces, and that Kruse Dewenter *Page 270 
would prevent competition in the designated territory. Hence there was something more than a mere sale and purchase. While, strictly speaking, there was no agency in fact, and the dealer did not represent the manufacturer, such relation as existed is frequently called `sales agency,' 55 C.J. 1343, note; Hendrickson v. International Harvester Company, 100 Vt. 161, 135 A. 702, or `exclusive agency,' 2 C.J. 421, note; Country Home Light Power Company v. J.J. Fitzgerald Company, 219 Ky. 313, 292 S.W. 833; Peters Branch of International Shoe Company v. Jones, 247 Ky. 193, 56 S.W.2d 994. Whatever the relationship may be called, there was a substantial property right annexed to the sale and purchase which was protected by the courts and for the violation of which relief might have been obtained against the one causing a breach of the contract. Annotations, 45 A.L.R. 1200; 23 R.C.L. 1199; Sedgwick on Damages, § 633. * * *"
The statute of frauds was not involved.
Plaintiff relies upon the case of Beebe v. Columbia Axle Co.,233 Mo. App. R. 212, 117 S.W.2d 624. In that case the plaintiff sued the defendant for breach of an oral contract to employ plaintiff as exclusive agent for the sale of equipment manufactured by the defendant. The plaintiff was designated as exclusive agent or factory distributor.
 "By the terms of said contract, the retail prices agreed upon at which the plaintiff was to sell the defendant's axles were $69.00 for the passenger car axle and $125.00 for the truck axle; and it was agreed that the plaintiff should be allowed a discount of 50% from said list or retail price and that he in turn should allow the dealers to whom said axles were sold a discount of 25%, resulting in commissions as compensation to the plaintiff of $17.25 for each passenger car axle sold and $31.25 for each truck axle sold. * * *" *Page 271 
Upon the making of the contract the plaintiff "entered upon his employment" and performed all of the duties imposed upon him and devoted all of his time to promoting the sale and distribution of defendant's product. The contract was for an indefinite period of time. It was made on 28 January 1935 and was canceled on 5 December 1935. The complaint charges that plaintiff was unlawfully discharged without just cause and without being given a reasonable opportunity to avail himself of the results of his preliminary efforts and expenditures, and seeks recovery for the reasonable value of his services plus his expenditures and less the amount which he received as "commissions or gross profits" on sales. The court said that the contract "does not appear to be a contract of sale, but appears to be a contract of agency", and the court held that although contracts of employment for an indefinite time may be terminated at will, nevertheless, if it appears that the agent was induced by his appointment in good faith, to incur expense and labor without having a sufficient opportunity to recoup such expense, the principal will be required to compensate him, and it was held that the plaintiff came within the exception mentioned and was entitled to recover on quantum meruit. The defendant contended that the contract in question was a sales contract and was void under the section of the statute of frauds dealing with the sale of goods, wares and merchandise. The court held that under the Missouri procedure one must plead the statute of frauds and that the defendant had not pleaded the section concerning the sale of goods, but only the section concerning contracts not to be performed within one year. The contract was in fact terminated within one year and the court held that plaintiff *Page 272 
could recover on quantum meruit to the extent that it had been performed. The court said:
 "If the contract in question were a contract of sale, the question of its indefiniteness as to quantity, prices, terms, and obligations would be of importance; and the authorities cited by the defendant in support of its contentions, based upon such matters, would be applicable; but, not so being, such authorities are inapplicable. They involve sales contracts only."
The case is distinguishable, the action being in quantum meruit and not upon the contract for breach thereof.
It should be observed in connection with the Beebe case, supra, and the cases now to be discussed, that the construction of a dealership contract, as to whether it is a sales or an agency contract, may be of importance in the decision of a case for reasons which have no connection whatever with the statute of frauds. For example, whether a contract be construed as solely a sales contract, or an agency contract, or one of sales and agency combined, may be determinative of the right to cancel the contract, yet, the classification of the contract for that purpose would have no bearing in determining whether or not, if oral, it is within the statute of frauds. In the case at bar the plaintiff cites a number of decisions in which dealership contracts have been classified as partaking of agency rather than sale, but in each instance the contract was in writing, the issue was the right to terminate and the statute of frauds was not involved. The cases thus cited are: Bredemeier v. Pacific SupplyCo., 64 Or. 576, 131 P. 312 (sale and agency); Bendix HomeAppliances, Inc. v. Radio Accessory Co., 129 F.2d 177 (sale and agency); Fargo Glass and Paint Co. v. Globe American Corp.,161 F.2d 811 (no sale involved); Champion *Page 273 Spark Plug Company v. Automobile Sundries Company, 273 F. 74 (both sale and agency); Kaempfer v. Tomkins-Kiel Marble Co.,Inc., 242 N.Y. 376, 152 N.E. 120 (agency); Willcox and GibbsSewing Machine Co. v. Ewing, 141 U.S. 627, 35 L. ed 882 (agency and sale). The last cited case, though relied upon by plaintiff, is a weak reed on which to lean. It was distinguished and its authority greatly weakened in Mathews Conveyer Co. v. Palmer-BeeCo., 135 F.2d 73 and in Standard Fashion Co. v. Magrane-HoustonCo., 258 U.S. 346, 66 L. ed 653, 254 F. 493, 259 F. 793. In the Palmer-Bee case, supra, the court said:
 "At the outset, it may be remarked that the word `agency' is frequently used to indicate that a dealer has the exclusive right to sell a specified article in certain territory; but such dealer does not thereby represent the manufacturer as agent in the sense in which that relation is understood in the law of principal and agent, but simply buys from the manufacturer in the regular course of trade and sells the article to the public. Such a transaction is a sale rather than an agency. * * *"
In the Magrane-Houston case, supra, the Court of Appeals said:
 "* * * The case is easily distinguishable in this regard from Willcox Gibbs Co. v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882. Full title passed from the plaintiff to the defendant. The defendant was selling its own goods to its own customers; it was not, under delegated authority, selling plaintiff's goods to the plaintiff's customers.
Upon appeal to the United States Supreme Court the same ruling was made.
We will next consider cases cited by the plaintiff which involved, or apparently involved, oral contracts. FalstaffBrewing Corp. v. Iowa Fruit and Produce *Page 274 Co., 112 F.2d 101 was an action for breach of what appears to have been an oral contract and for conspiracy to breach a sales agency contract and to harm the business of the plaintiff. Judgment for the plaintiff was affirmed. The plaintiff entered upon the preparation for and performance of the contract and the defendant then terminated the contract and lured away the plaintiff's salesmen. Upon appeal the defendant contended that it had a right to terminate the contract because it was indefinite as to duration and quantity to be purchased. The court said this was an agency, not a sales contract. The statute of frauds was not invoked but on the contrary the issue related to indefiniteness or lack of mutuality. The court said:
 "* * * Whether or not this is an agreement to purchase a definite or approximate quantity is not important here. This is not a contract of sale, but one of sales agency. A contract of sales agency is not void for uncertainty, indefiniteness, or lack of mutuality, so called, because no definite quantity is named in the contract. * * *"
If the issue of the statute of frauds had been raised, a different question would have been presented.
In Kelly-Springfield Tire Co. v. Bobo, 4 F.2d 71, the plaintiff and the defendant entered into an oral contract whereby the plaintiff was to have the exclusive right to purchase and sell the defendant's products at such prices as defendant might prescribe. Plaintiff was to devote his entire time and attention to the business. It was contended by the defendant that the contract was one of agency and terminable at will; that it was void for uncertainty and that the contract was void under the statute of frauds. The court said:
 "* * * As said by the Supreme Court in Banker Brothers v. Pennsylvania, 222 U.S. 210, *Page 275 32 S.Ct. 38, 56 L.Ed. 168. `This is one of the common cases in which parties find it to their interest to occupy the position of vendor and vendee for some purposes under a contract containing terms which, for the purpose of restricting sales and securing payment, come near to creating the relation of principal and agent'."
It was held that the defendant could not revoke the contract at will "whether it be construed as a contract of agency or a contract of sale." It was further held that the contract was not void for uncertainty and that it might be fully performed within a year and "therefore the statute of frauds has no application." The clear implication is that if the contract had been one which could not be performed within one year the statute of frauds would have barred recovery.
In Erskine v. Chevrolet Motors Co., 185 N.C. 479,117 S.E. 706, the plaintiffs sued in part upon an oral agreement under which they became dealers to handle defendants' product. Upon the faith of representations by defendants that the contract would not be canceled and that automobiles would be delivered as ordered, the plaintiffs expended large sums of money in establishing agencies and the like. The defendants obligated themselves to sell and the plaintiffs to buy. Thereafter the defendants repudiated the contract. The only comment concerning the statute of frauds is as follows:
 "The agreement is not affected by the statute of frauds. The two cases relied on by defendants for the suggestion as to the statute, viz. W. City Fire Ins. Co. v. Lichtenstein, 181 App. Div. 681, 685, 169 N.Y. Supp. 146, and Pearlberg v. Levisohn, 112 Misc. Rep. 95, 182 N.Y. Supp. 615, were both decided in New York; the statute of that state and ours being essentially different as to contracts not to be performed within a year, and in other respects." *Page 276 
It is impossible to tell whether the court based the right of recovery upon contract or upon false representations relied upon. We find no statute of North Carolina which then required that such contracts be in writing.
Plaintiff also cites Kaufman v. Farley Manuf'g Co., 78 Iowa 679, 43 N.W. 612. The plaintiffs who were manufacturers of cigars sued the defendant to recover money owed, which claim was admitted. The defendant filed a cross-petition alleging a contract whereby he received the exclusive right to sell plaintiff's cigars within a designated territory and whereby defendant was to make expenditures in developing the territory. Defendant alleged further that plaintiffs agreed to supply defendant's requirements so long as defendant desired to deal and that plaintiffs breached the contract by refusing to furnish cigars. It was held that the contract was sufficiently definite. By way of defense it was contended that the contract was unenforceable under the statute of frauds since it was not in writing. The court quoted the statute as follows:
 "* * * Such contracts embrace (1) those in relation to the sale of personal property, when no part of the property is delivered, and no part of the price is paid. * * *"
It was held that the contract was entire and that there was not a separate contract for each lot of cigars that was delivered, consequently, since a portion of the cigars were delivered and paid for, it was held that there was such a part performance as to take the case out of the statute of frauds. The inference is clearly to the effect that the contract would have been unenforceable but for the fact of delivery and payment. Upon the question as to whether the statute *Page 277 
of frauds applies to dealers contracts involving purchase and sale, the case is against the plaintiff's contention. The question of alleged part performance will be considered later.
In Michelin Tire Company of Calif. v. Williams, 125 Or. 689,268 P. 56, the defendant was a sole trader engaged in the retail tire business. Pursuant to a written agreement defendant became a dealer in the plaintiff's tires and tubes. It was provided that the dealer should have authority to adjust claims in respect to tires sold by him, should maintain the company's list prices, and should sell all articles in strict rotation in accordance with serial numbers of the product. Thereafter an oral agreement was made, concerning which the court said:
 "This is a case where the plaintiff says to the defendant in effect: `If you will give me an additional guaranty to the amount of $15,000, I will sell you goods on credit to the amount of $25,000.' The guaranty is given, but the goods are not delivered nor is any earnest given to bind the contract. * * *"
The court set forth the statute of frauds as it appears in the sales act and said:
 "* * * Whatever may be the rule in equity the contract could not be enforced at law. The writer at first impression was inclined to the opinion that the delivery to plaintiff of the guaranty might be construed as an `earnest' to take the contract out of the statute, but the authorities are to the contrary: Walker v. Nussey, 16 Mees. W. 302. We reluctantly conclude that while plaintiff's repudiation of the contract is censurable in morals its only effect legally was to discharge the guarantor from any legal liability to the plaintiff upon it. The guaranty was not in evidence. If it had recited the *Page 278 
terms of the contract and had been accepted in writing by plaintiff or any authorized agent of plaintiff, such acceptance might have been a sufficient memorandum to have authorized this defense; but there is no evidence to that effect. While partial performance of an oral contract in regard to the conveyance of lands has been sometimes held in equity to take a contract out of the statute, such has never been the rule in regard to a contract for the sale of goods: * * *".
The case is a direct authority for the proposition that an oral dealership contract which contains provisions for purchase and sale, together with other provisions concerning guaranty, is within the statute of frauds. See also International Shoe Co. v.Lacy, 114 Ind. App. 641, 53 N.E.2d 636. When that statute is invoked the authorities cited demonstrate that the real issue is whether the contract contains an agreement to sell or a sale, either with or without other provisions. The authorities are not in accord as to whether a separable portion of a single contract may be enforced if not within the statute when other portions are within it. Compare Williston, supra, with cases cited in 71 A.L.R. 496. In the case at bar the alleged contract is so clearly indivisible that it is unnecessary to decide whether the result would be different if the provisions for purchase and sale were separable from those which are in the nature of agency. The sale of oil burners by the defendant to the plaintiff is of the essence of the entire agreement. The other provisions, if divorced therefrom, would be meaningless.
Since it is established and conceded in the case at bar that the oral contract involved transfer of title, and since the contract is indivisible, it follows that it was within the statute of frauds and is unenforceable *Page 279 
unless within the statutory exception, i.e., "unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, * * *".
We will next consider the plaintiff's contention that even if the contract is within the statute of frauds, it has been taken out of the statute by part performance. In the recent case ofDodge et al. v. Davies et al., 181 Or. 13, 179 P.2d 735, the plaintiff brought suit in equity to compel the defendant to specifically perform an alleged oral contract whereby defendant, as landlord, was to lease to the plaintiff, as tenant, real property, for a term of years. Plaintiff alleged that in reliance on the oral lease it made substantial expenditures and permanent improvements on the property. It was contended that the case was taken out of the statute of frauds by acts of part performance. This court said:
 "* * * To take such an oral lease out of the statute of frauds, however, the acts of part performance must be exclusively referable to the oral lease. * * *"
In Brown v. Lord, 7 Or. 302, the plaintiff as alleged vendee sought specific performance of an oral contract for the sale of lands. The court quoted with approval from an Indiana case to the effect that the act of performance must be "palpable and evident to the senses * * * an act that can be relied on as certain, about which there can be no misunderstanding * * *", and then added:
 "* * * But even these acts of part performance must be done with a direct view of the agreement being performed and such acts as could be done in no other view, or the agreement will not be taken out of the statute. * * *" *Page 280 
To the same effect see Armour Co. v. Freeman Baking Co.,197 Mich. 421, 163 N.W. 896. The burden is upon the plaintiff to show that delivery and acceptance is pursuant to the oral contract.Libman v. Fox Pioneer Scrap Iron Co., 175 Wis. 485,185 N.W. 551. See also Dunis v. Director et al., 121 Or. 500,255 P. 474; Jenning v. Miller, 48 Or. 201, 85 P. 517; Brennen v.Derby, 124 Or. 574, 265 P. 425. The above cited cases were tried in equity.
A stricter rule prevails in actions at law:
 "* * * While partial performance of an oral contract in regard to the conveyance of lands has been sometimes held in equity to take a contract out of the statute, such has never been the rule in regard to a contract for the sale of goods * * *" Michelin Tire Company of Calif. v. Williams, supra.
In Galvin v. MacKenzie, 21 Or. 184, 27 P. 1039, the plaintiff brought an action of law to recover money upon an oral agreement to furnish the defendant two dresses. The defendant's answer alleged that they were never received and accepted by her. The trial court held that the agreement was one for the sale of personal property at a price exceeding $50 and that it was within the statute of frauds. The court then submitted to the jury the question as to whether the goods had been received and accepted under the contract. Upon appeal to the Supreme Court the question was whether there was evidence entitling the jury to find that there was such an acceptance and receipt of the property as would satisfy the provisions of the statute of frauds. The court said:
 "* * * To constitute an acceptance within the meaning of this provision, the purchaser must so deal with the property as to prove that he acknowledges the existence of the contract. There must be *Page 281 
some act on his part plainly recognizing the existence of the contract and that the property has been received in accordance therewith. The property must be completely transferred, which includes both delivery by the vendor and acceptance by the vendee. There must be a delivery of the goods by the vendor with an intention of vesting the right of possession in the vendee, and there must be an actual receiving and acceptance by the latter with the intention of taking possession as owner. * * *"
 Brown v. Sheedy, 90 Or. 74, 175 P. 613 was an action at law to recover possession of personal property. The plaintiff contended that he had purchased cattle from the defendant by an oral agreement. The defense was the statute of frauds coupled with the claim that the plaintiff did not accept or receive any part of the property or pay any part of the purchase money. The court referred to the statute O.C.L.A., § 2-909. Par. 5, which provides that an agreement for the sale of personal property at a price not less than $50 is void unless the buyer accept and receive some part of such personal property, or pay at the time some part of the purchase money. The court then cited with approval the portion of Galvin v. MacKenzie, supra, which we have quoted. It is significant that in Brown v. Sheedy, a law action, the court quoted with approval from Reynolds v.Scriber, 41 Or. 407, 69 P. 48, an equity suit, as follows:
 "* * * To constitute a part performance, however, within the meaning of this rule, the acts relied upon for that purpose must have reference to the contract, and clearly appear to have been done solely with a view to its performance. Acts merely preliminary or ancillary to the agreement, such as delivering an abstract of title, giving directions for a conveyance, the preparation of the agreement, *Page 282 
making valuations, and other like acts, are not sufficient: 2 Story, Eq. Jur. (13 ed.) § 762; Waterman, Spec. Perf. § 262. Whatever was done must have been done under the contract, and in part performance of its terms, and should tend to show not only that there had been an agreement, but throw some light upon its nature, so that neither the fact of the contract nor its execution rests solely upon parol evidence. * * *"
It was held in Brown v. Sheedy that there were no actions sufficient to take the case out of the statute of frauds.
 In Cassidy v. Kraft-Phenix Cheese Corporation, 285 Mich. 426, 280 N.W. 814, the court said:
 "In arriving at the above conclusion we are mindful of plaintiff's contention that the alleged oral contract has been partially performed by plaintiff and, therefore, should be held valid. Here again plaintiff's position is not tenable because the declaration, fairly construed, discloses merely that plaintiff did some things which were preliminary to the performance or execution of the contract, not that he did them in performance of the contract. * * *"
Other authorities supporting the rule that the acceptance and actual receipt or payment must be exclusively referable to the contract are as follows: 37 C.J.S., Frauds, Statute of, § 150;Doyle-Kidd Dry Goods Co. v. Ingram, 110 Okla. 3, 236 P. 37;Kansas Flour Mills Corporation v. Dreyfus Bros., 170 Okla. 325,40 P.2d 20; Golden Eagle Milling Co. v. Old Homestead Bakery,59 Cal.App. 541, 211 P. 56; Mason-Walsh-Atkinson-Kier Co. v.Stubblefield, 99 F.2d 735, C.C.A., 9th; Russell v. Wisconsin,M. P. Ry. Co., 39 Minn. 145, 39 N.W. 302.
In Libman v. Fox Pioneer Scrap Iron Co., supra, it was held that where there are two contracts, one oral *Page 283 
and one written, the delivery of goods must be shown to have been made under the oral contract to take that contract out of the statute. See also Brister Koester Lumber Corp. v. AmericanLumber Corp., 356 Pa. 33, 50 A.2d 672; Scott v. Troop WaterHeater Co., 345 Pa. 368, 28 A.2d 922; Wieser v. Emerman Baumoehl Co., 185 N.Y.S. 79; M. Samuel Sons, Inc. v. Cutleret al., 185 N.Y.S. 368; Franklin Sugar Refining Co. v. Eisemanet al., 290 Pa. 486, 139 A. 147.
We have already indicated that there was a substantial conflict of testimony as to the nature of the agreement and transaction between plaintiff and defendant, both in the pleadings and in the evidence. In the complaint, plaintiff relies upon an oral contract whereby he became the exclusive dealer, within the designated territory, for the purchase and sale of oil burners, whereas the defendant denies that there was any exclusive contract, but alleges that it informed the plaintiff that it would accept orders pending the issuance of individual dealer franchises and would distribute its limited supply among its dealers and other retail outlets in a fair and equitable manner. Thereafter the defendant sold to the plaintiff and the plaintiff sold to its customers oil burners. The question as to the exclusiveness of plaintiff's agency is of the essence. Evidence was adduced that defendant referred prospective buyers to the plaintiff and allowed him the amount of profit he would have made on a sale made by the defendant. This tends to support the contention that sales were made which were exclusively referable to the exclusive contract. But on the other hand, the evidence offered by the defendant, presented for the consideration of the jury the reasons which induced defendant to refer prospective purchasers to the plaintiff, *Page 284 
reasons which were based on considerations other than and not referable to the alleged exclusive contract. Defendant's evidence showed that inquiries were received in such volume that its retail division was unable to handle them, hence they were referred to the plaintiff. The testimony of plaintiff and defendant was in violent disagreement as to the agreement pursuant to which sales, deliveries, and acceptances and payments were made, and since the evidence is conflicting as to whether the sales to plaintiff were pursuant to the alleged exclusive contract or the nonexclusive dealership, it follows that there was a question of fact for the jury to determine and that question was whether the sales, deliveries, etc., were referable to the oral contract claimed by plaintiff. If the plaintiff failed to secure a favorable decision from the jury on this issue, then the contract remained unenforceable under the statute of frauds. A careful examination of the instructions to the jury fails to disclose any mention or comment by the trial judge concerning the existence or applicability of the statute of frauds. The defendant requested two instructions as follows:
"INSTRUCTION XV
 "In this case the plaintiff relies for recovery upon an oral contract alleged to have been made with an agent of defendant. This agreement, if you find that it was made, constituted a contract for the sale of personal property at a price of not less than $50.00 within the meaning of the Statute of Frauds. Accordingly the defendant could not be held bound by such alleged contract unless the plaintiff accepted and received some part of the property contracted to be sold, or gave something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of *Page 285 
the contract was signed by the defendant or its duly authorized agent.
"INSTRUCTION XVI
 "There is no evidence in this case of the signing of a sufficient note or memorandum in writing and accordingly the Statute of Frauds will preclude plaintiff's recovery as to each cause of action unless you should find by a preponderance of the evidence that the delivery to and acceptance by the plaintiff of some oil burners was pursuant to the alleged oral agreement. In other words, if you should find that the delivery to and acceptance by plaintiff of all oil burners received by him was pursuant solely to orders which he had placed and which had been accepted by defendant independent of the alleged oral contract, such delivery and acceptance would not constitute compliance with the Statute of Frauds as to other orders and in that event your verdict would be for the defendant."
The court refused to give the instructions requested, to which refusal, exceptions were taken and allowed. The defense of the statute of frauds was also raised by motion for nonsuit and for directed verdict, but upon this aspect of the case we cannot hold that a nonsuit or a directed verdict should have been awarded because, if the oral contract was proven as alleged by the plaintiff, and was sufficiently definite, then the plaintiff was entitled, upon proper instructions, to have the issue of acceptance or receipt pursuant to the contract submitted to the jury. We must, however, at this point, hold that there was prejudicial error committed by the trial court in failing to submit to the jury the issues of fact arising under the defense of the statute of frauds.
The plaintiff argues that the institution of the defendant's counter claim constituted a waiver of the *Page 286 
statute of frauds, and in support, the following authorities are cited: 37 C.J.S. 748, Frauds, statute of, § 246; Christensen v.Wooley, 41 Mo. App. Reports 53; Thompson v. Hurson, 201 Mich. 685, 167 N.W. 926. The contention is without merit. The authorities cited hold that the statute may be waived by instituting an action or counter claim based on the oral contract. The rule is based upon the idea that a party cannot take inconsistent positions by relying upon the oral contract for relief while denying its enforceability under the statute of frauds. In the case at bar the counter claim merely alleges that the defendant furnished stock and merchandise of the reasonable and agreed value of $8,882.75 at the special instance and request of the plaintiff. There is nothing in the counter claim, as alleged, to show that this indebtedness was based on any exclusive dealership contract, and the answer as a whole indicates that it was not.
 "The solemnity of a written agreement should not be frittered away by waiver or estoppel, except in cases of clear and convincing situations. * * *" Craswell v. Biggs, 160 Or. 547, 86 P.2d 71.
We next inquire whether there was evidence of a contract sufficiently definite in terms to be enforceable. The normal procedure under our state practice would be to ascertain what contract was alleged in the pleadings and then to search for evidence supporting it, but an attempt to follow this procedure in the case at bar gives rise to difficulty. At the beginning of this opinion we quoted the allegations of the complaint indicating that plaintiff claimed an agreement whereby he could sell to all customers such coal burners or oil burners as such customers might require. We quoted other allegations indicating reliance on a requirements contract. *Page 287 
We find no suggestion in the complaint that the contract merely entitled plaintiff to receive burners upon an equitable distribution thereof among dealers. Point 3 of plaintiff's brief reads as follows: "Exclusive dealership contract requiring dealer to handle manufacturer's products and to purchase all his requirements from manufacturer imposes implied obligation on manufacturer to supply dealer's requirements for products." The following cases are cited in support: Long Beach Drug Co. v.United Drug Co., 13 Cal.2d 158, 88 P.2d 698; Mills-MorrisCompany v. Champion Spark Plug Co., 7 F.2d 38, C.C.A., 6th; JayDreher Corporation v. Delco Appliance Corp., 93 F.2d 275, C.C.A., 2d; Schnerb v. Caterpillar Tractor Co., 43 F.2d 920, C.C.A., 2d; Nathan Elson Co. v. H. Beselin Son,116 Neb. 729, 218 N.W. 753.
Again in its brief plaintiff asserts that:
 "* * * under the exclusive dealership contract between the parties, Appellant was obligated to deliver sufficient burners to enable Respondent to perform his contracts then existing * * *"
We express no disagreement with the authorities cited except to say that when there is an express agreement as to the amount of product which a manufacturer is to supply to a dealer, there could be no implied agreement inconsistent therewith. However, the plaintiff has abandoned all claim to a requirements contract. In the oral argument before the court, counsel for plaintiff was asked if he claims that defendant was obligated to fill whatever orders plaintiff took from his customers. To the question, counsel answered: "* * * Our position is that we could expect deliveries only in conformance with the ability of the factory to manufacture, and based upon an equitable distribution *Page 288 
of burners among dealers. * * * We do not claim it was a requirements contract."
It is obvious that this change of position was necessitated by the absence from the record of any substantial evidence that the parties had made a requirements contract. We have previously quoted the testimony of the plaintiff that Read "warned" him that at first the production of burners would be rather slow. We have also set forth the letter of 18 October 1945 which was sent by Vice President Burg to the plaintiff and which stated that during the next few months the volume produced would be somewhat limited because of the difficulties of the reconversion period, etc., but that as materials became more abundant they would step up production to the point where all dealers could secure as many burners as they could sell, and in which Mr. Burg said: "* * * in the meantime we will distribute a limited supply available among our dealers in a fair and equitable manner." We also refer to the previously quoted testimony of the plaintiff in which he said that he treated the letter as a franchise and that it confirmed certain terms of the earlier verbal agreement on which plaintiff says he relies as "the basis of Respondent's causes of action". We are unable to see how a letter expressly stating that defendant would distribute a limited supply in a fair and equitable manner could be a confirmation of an agreement to supply plaintiff's requirements to the extent of 82 oil burners unless the 82 burners constituted the plaintiff's equitable share. In any event, we consider plaintiff bound by his declaration made before this court. If it should be argued that this change of position as to the terms of the agreement constitutes a variance, we think defendant would not be in a position to complain, for the equitable distribution theory was the one which *Page 289 
was consistently asserted in pleadings, proof and brief by the defendant.
Plaintiff's present contention, briefly stated, is that defendant was bound to sell and deliver "in conformance with the ability of the factory to manufacture, and based upon an equitable distribution of burners among dealers" and that under that agreement defendant was obligated to supply the 82 burners for which plaintiff had taken orders. The defendant having failed to supply them, the plaintiff lost anticipated profits. Both causes of action are based upon one and the same original contract. The second cause seeks damages because defendant admittedly sold oil burners at retail which is claimed to have been a violation of the alleged exclusive dealership agreement. But although there is evidence of a quota agreement tending to support the first cause of action, and of an exclusive dealership agreement tending to support the second, it remains to be decided whether there is evidence showing that in other respects the alleged contract was sufficiently definite to be enforceable. The defense contends that there were numerous items which should have been covered by the agreement, but as to which, the record supplies no definite information. It is contended that there was no sufficiently definite agreement as to the duration of the contract. It was to be "similar" to the stoker contract which was for one year, but the evidence shows that plaintiff and his partner both considered that the contract was terminable on thirty days notice. Plaintiff testified that the stoker contract "was on a year's basis and could be cancelled in thirty days." His partner testified as follows:
 "Q Of course, you both recognized that you were only operating on a thirty-day basis under your contract with the Iron Fireman? *Page 290 
 "A We always knew that, that was the reason we checked so carefully with our orders."
The complaint appears to be drawn upon the theory that the contract was terminable upon reasonable notice. It prays for damages on the second cause of action on account of retail sales made by defendant down to the 4th day of June, 1946, which date is considerably short of the expiration date of the alleged one year contract. The notice of termination written by the defendant at Cleveland, Ohio, was dated 26 April 1946 and stated that it was written "as a matter of record so as to clear away any outstanding contracts or franchise agreements now applying to the sale of our products in the Portland area", and it suggested termination of the written franchise "thirty days from the date when you will receive this letter * * *" It thus appears that plaintiff fixed the 4th day of June in his complaint because that day was approximately thirty days from the date of his receipt of the letter of 26 April. Finally the record discloses that plaintiff abandoned all claim to a contract for the full period of a year, for he requested the court to instruct the jury that if they found that the parties had made an exclusive contract "Defendant could not terminate such contract or refuse to deliver oil burners contrary to the terms of such contract without the giving to Plaintiff of a notice of such termination, which notice must be given a reasonable time before such termination date becomes effective." The court gave the instruction as requested. The plaintiff cannot now take a position inconsistent with that which he induced the trial court to take. His case now stands upon the claim of an implied provision of the contract that it could be terminated upon the giving of reasonable notice. *Page 291 
The defendant cites many authorities to the effect that preliminary negotiations looking toward a contract are not sufficient; that a contract must be definite and that there must be mutuality — that is to say, some binding obligation on both sides. There are authorities also quoted for the proposition that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, then there is no contract until the writing is signed. See Williston on Contracts, Revised Edition, pp. 52, 53, 54, 59, 98; Reed et al. v.Montgomery, 180 Or. 196, 175 P.2d 986; Dimitre Electric Co. v.Paget, 175 Or. 72, 151 P.2d 630. The defendant cites many cases in which dealership contracts have been held unenforceable, either because indefinite or for want of mutuality. We have examined them all and are of the opinion that they do not control the pending case. The evidence for the plaintiff shows that it was contemplated between the parties that the plaintiff should become the exclusive dealer in oil burners pending the receipt of a written franchise. On 21 March 1946 Mr. Read wrote to R.E. Gunn, Assistant General Sales Manager at the Cleveland office and referred to Mr. Howland's "working arrangement". He continued, "My records indicate that Howland has been operating on more or less of an implied dealership basis and, naturally, the wording of your cancellation notice will be in accordance with this understanding." The parties actually operated under the working agreement without disagreement as to its terms, except as to three matters; (1) the exclusiveness of the agreement, (2) its duration, and (3) the quantity which defendant undertook to supply. We think it was for the jury *Page 292 
to determine from the conflicting evidence what the agreement was upon those three points.
Influenced by the realities of modern business practice, the courts manifest a tendency to uphold dealership contracts similar to the one asserted here as against attack on the grounds of indefiniteness or lack of mutuality. Moore v.Shell Oil Co., 139 Or. 72, 6 P.2d 216; Moon Motor Car Co. ofNew York v. Moon Motor Car Co., Inc., 29 F.2d 3; Jay DreherCorporation v. Delco Appliance Corporation, supra; Schnerb v.Caterpillar Tractor Co., supra; Falstaff Brewing Corp. v. IowaFruit Produce Co., supra; Ken-Rad Corp. v. R.C. Bohannan,Inc., 80 F.2d 251; Beebe v. Columbia Axle Co., supra; Sargentv. Drew-English, Inc., 12 Wn.2d 320, 121 P.2d 373; Nathan Elson Co. v. H. Beselin Son, supra; Kelly-Springfield Tire Co. v.Bobo, supra; Abrams v. George E. Keith Co., 30 F.2d 90;Erskine v. Chevrolet Motors Co., supra; Western Beauty SupplyCo. v. Duart Sales Co., 192 Okla. 6, 133 P.2d 202. The contract disclosed in the plaintiff's evidence is not in our opinion void for uncertainty or lack of mutuality, nor is it void because the parties contemplated a later written contract. The evidence clearly discloses that pending the receipt of the written franchise, the plaintiff was to operate as a dealer.
Having concluded that there was some evidence of a contract sufficiently definite which required submission of the case to the jury upon the issues of the meeting of minds and of consideration, we must next determine whether there was any substantial evidence of a breach of the alleged contract resulting in damage to the plaintiff. Upon the first cause of action the plaintiff had orders from his customers for 82 burners. The 82 orders were canceled by the plaintiff owing to *Page 293 
his inability to secure the burners from the defendant. The question is whether the failure of the defendant to furnish burners constituted a violation of its agreement to deliver burners "in conformance with the ability of the factory to manufacture, and based upon an equitable distribution of burners among dealers." Plaintiff relies upon the following evidence as tending to show that his quota entitled him to more burners than he received. Mr. Howard, manager of the sales department of the defendant company assured the plaintiff in October or November that plaintiff could reasonably expect to receive from two to five burners a day depending upon production. In December, 1945, plaintiff was told that the factory was going to shut down for inventory and for the Christmas holidays, but he was also informed that the defendant would be resuming deliveries as of the first of the year. The plaintiff testified:
 "BY MR. COAN: Q Now, Mr. Howland, I think yesterday you testified that Mr. Howard told you to keep on taking orders for burners, what is the fact about that?
"A That is correct.
 "Q Did he ever at any time tell you not to take any more orders?
 "A No one at any time told me not to take more orders. I stopped of my own accord. I thought the information coming from the factory was rather insecure.
"* * *
 "A * * * We apprised him of the orders we had taken at all times, and he was quite enthusiastic about the showing that we were making on them, and he told us to go ahead and take them and get more orders. Does that answer your question?
 "Q Yes, I think so. You said he told you to go *Page 294 
ahead and take more orders, that he was pleased with those you had taken?
"A Yes, sir, he did.
"Q When, about, was that?
"A That was on several occasions.
"Q When would you say was the last?
 "A He told us that as early as October or November, and he told us that in December * * *"
Speaking of his conversations with the plaintiff, Mr. Howard testified:
 "A * * * I did comment on the possibility of making delivery, and I told him the facts on deliveries, practically every time he called, the fact being, of course, that we would allocate our production over our western division dealers, and that he would get his proportion of them.
 "Q What is the earliest of such conversations that you recall, Mr. Howard, or possibly you can tell us over what period of time these conversations extended?
 "A Well, they extended from October, at least, I am sure they started about the first of October, and extended on through December."
There is further evidence that in October, November and December, the defendant manufactured 2291 burners of which about one-third was shipped to the eastern division dealers. Mr. Howard testified, "the balance of it, was shipped to the western division dealers and the Portland retail."
The defendant introduced an exhibit showing the distribution of the 1945 production to dealers in the western division. It shows that in 1945, 980 oil burners were shipped to western division dealers. If one-third of the production for the last three months of 1945 was shipped to the eastern division dealers, it *Page 295 
would follow that 1528 burners, or two-thirds of the 2291 burners were disposed of to dealers in the western division and by retail sales. If 980 burners out of the 1528 were sold to western division dealers, it would appear the 548 were disposed of by the defendant at retail as contrasted with the defendant's admission that 294 burners had been sold at retail. We think the jury may have drawn an inference that a larger number of burners was sold at the Portland retail department than has been acknowledged by the defendant, and that therefore since such sale by the defendant at retail was in violation of the alleged exclusive agreement, the plaintiff's quota would have entitled him to additional burners out of the stock which should not have been, but was, sold at retail. Again the plaintiff testified:
 "A I said I was in touch with him almost daily, and many times I talked with him about the orders we had on hand, and if he was in a position to fill them, and if it was safe to take more, but I did not ask him every day, that is, check with him day by day to tell him how many orders there were. I would call him and say, by way of illustration, `I have one hundred orders, your value of $40,000.00, do you think a hundred is all right, or should I slow down, or go ahead and take them?' And he would say, `Yes, I think it would be all right, we can deliver them. Go ahead and get them.'
 "Q And that continued until December, when he told you they were closing for Christmas?
 "A Yes, I think the general practice was followed all the way through.
"Q It wasn't followed in December, was it?
 "A No, I don't think it was necessary to follow it in December, I would say, no.
"Q Do you recall whether it happened or not?
 "A No, I would not be able to place it that close, any date. *Page 296 
 "Q Are you fairly certain in your mind that was the procedure followed until your last delivery in December?
 "A Am I fairly certain that that was followed until the last delivery in December?
 "Q Yes, were you talking with him all the time until your last delivery in December?
 "A I think I talked with him as late as that, and maybe later."
Plaintiff's partner Scovell also testified that the plaintiff was encouraged to take more orders in December. There is also evidence that defendant had on hand 130 burners during the latter part of January, 1946, at least 103 of which were turned over to the retail department. If the plaintiff was entitled to a quota of from two to five burners per day, and if the contract was not canceled until June 4, 1946, we think the jury could have concluded that the plaintiff was entitled to more burners than he received, notwithstanding the fact that plaintiff acknowledged that he received 198 burners up to 12 December 1945, and 8 more in February. A quota of 2 per day from 1 September 1945 to 4 June 1946 would have entitled plaintiff to about 500 burners. We are well aware of the persuasive if not convincing evidence that the quota depended upon production; that production was severely curtailed by conditions beyond the control of the defendant and that plaintiff received a larger percentage of his orders than any other dealer in the country; that on 7 January 1946 defendant had received 1344 orders for burners of which only 323 had been accepted, and that only 29 burners were manufactured in February 1946 and none in March. But in passing upon the motion for directed verdict our function is limited by constitutional mandate too well known to require citation. We find that *Page 297 
there was some substantial evidence that plaintiff was entitled under his quota to receive more burners than were in fact delivered to him. There is therefore some evidence of a breach of contract by reason of failure to furnish to the plaintiff at least some of the 82 burners for which he had secured orders.
As to the second cause of action based upon sales made at retail by the defendant in violation of the alleged exclusive agreement, the defendant admits 294 retail sales, and, as we have said, the jury could have found that the number was greater, but the fact that a certain number of retail sales were made by the defendant does not of itself alone constitute any evidence that the plaintiff was entitled to receive all of the burners thus sold at retail. Plaintiff's right to recover profits would depend, not alone upon the number of burners improperly sold by the defendant, but also upon the number of such burners to which the plaintiff was entitled under his quota and which he could have sold at a profit. Without extending this opinion to unreasonable lengths, we cannot review all of the evidence on the issue of breach and damage. We have read and reread the transcript of testimony and hold that upon the second cause of action there is some evidence of breach, and therefore of damage.
The case is thrown into confusion worse confounded by the shifts of position and legal theory on the part of the plaintiff, by the failure to disclose his final theory until argument on this appeal and by instructions which submitted issues not now relied upon and which permitted recovery to an extent not proven by any evidence. As an example, we cite the fact that the jury awarded the plaintiff the full amount of the plaintiff's claim for lost profits on 82 burners. The profits *Page 298 
recovered in each instance represented the price at which plaintiff could have sold the burners, less a sum representing the net cost of the burners plus the installation cost. Plaintiff was asked:
 "Q You are asking for, in your complaint, the difference between your direct cost and the price you were to get for the job, are you not?
"A Yes."
 "Q You have not counted in anything for salesman's commission?
 "A No, I am quoting direct cost. I distinguish between an operating and direct and indirect cost. That part of the cost I am considering in that instrument pertains to the direct operation and installation of the furnaces, distinctly different from overhead expenses, such as you mentioned yourself, and office rent and telephone."
After testifying to plaintiff's overhead expenses, including commissions paid his salesmen, plaintiff testified:
 "Q You said on this particular deal that you would have earned $114.00, but it would not have been that much because you would have had to pay $40.00 to Mr. Sherman?
 "A We did pay Mr. Sherman that. Not what we would have had to pay, but what we did pay. We did pay Mr. Sherman. I repeat again, that these are gross profits figures and over-head expenses that would have had to be deducted from these figures.
 "Q What you are asking then, is that the Iron Fireman pay you your gross profits plus the money you paid to Sherman is that it?
 "A Yes, not only the money we paid to Sherman but other expenses that we had in the business that we had to pay and could not avoid paying on that particular group of orders. * * *" *Page 299 
The amount of the verdict establishes that plaintiff received on the first cause of action the exact amount of his gross profits on 82 burners in the sum of $9,926.78 plus the item of $358.12 special damages pleaded in his complaint. In any event, plaintiff could only be entitled to his net profit. Furthermore, on the most liberal view of the pleadings plaintiff was not entitled to recover expenses in addition to profits as claimed by him in the testimony quoted. No expenses, with the exception of the item of $358.12 were prayed for in the complaint and none were awarded. A further illustration of regrettable confusion at the trial was the apparent duplication of recovery on the two causes of action. Upon the first cause, plaintiff recovered as damages the total gross profits which he would have made on 82 sales if he had received and sold the burners. If plaintiff had received and sold the 82 burners, the defendant's supply from which he could have sold at retail, would have been reduced by 82. This consideration appears to have been overlooked or ignored. Plaintiff should not recover profits on the theory that he was entitled to 82 burners which he did not receive and then also recover profits on the theory that the defendant wrongfully sold the same 82 burners at retail.
Since we find the defendant entitled to a new trial, we will consider some of the other assignments of error. The second assignment is as follows:
 "The court erred in requiring appellant to produce and in admitting in evidence, over appellant's objection, records showing the number of sales of oil burners by appellant in Multnomah County, between October 18, 1945 and June 4, 1946, as follows:" *Page 300 
Counsel for the defendant stated, among others, the following objection to the admissibility of the evidence:
 "* * * I wish to point out further that this list of sales is relevant only insofar as it covers a period in which Mr. Howland was an exclusive dealer. The testimony shows that there was no such agreement in existence and, if it was in existence, it could not have started before October 18, and it definitely came to an end at the time Mr. Howland was informed he was to get no more burners, and he accepted that statement he was to get no more burners, and he closed his place of business in March of that year, and he is seeking to recover on burners sold down to June 4, on the statement that his contract did not come to an end until he was given formal notification that his stoker franchise was ended."
The evidence was received as to sales from 18 October 1945 to 4 June 1946 without any limitation as to its use.
While it is not undisputed, there is evidence from which the jury could have found that a sufficient notice of termination was given orally in February and that plaintiff treated it as such. Plaintiff was asked if he received any notice of termination other than the letter of April 26, 1946. He answered:
 "A No, that was our notice of the termination of our contract, with this possible exception: At the time Mayne Read called at our office, after the conference with Mr. Burg, he said they had decided that they were going to have a retail branch in Portland, and we would be out of it and we would receive notice of it."
Plaintiff testified:
 "Q When did you receive any information from the Iron Fireman staff that the company was going *Page 301 
to handle both the stokers and oil burners through their retail branch?
 "A That was past the middle of February, 1946, when Mr. Read came over.
"* * *
 "Q When did you first come to the conclusion you were going to have to cancel your orders, that you would not receive any more burners and you would have to cancel your orders?
 "A After Mr. Read came over and told us that we were not going to get any.
"Q That would be some time after February 14, 1946?
"A Yes, sir."
It will be recalled that the complaint stated that "on or about the 15th day of February, 1946 * * * Defendant notified Plaintiff that it would not deliver to Plaintiff the oil burners necessary to fill the orders that Plaintiff had taken * * *." Evidence as to the number of retail sales made by the defendant could be relevant only if the sales were made prior to the termination of the plaintiff's dealership, by which we mean, prior to the expiration of a reasonable time after notice of termination. The court submitted the case to the jury upon an instruction that plaintiff must prove that the agency was in effect from 18 October 1945 to 4 June 1946. In view of the conflicting evidence as to when the contract was terminated, we think the court should have instructed the jury that they should consider the evidence as to the number of retail sales, only if the sales were made during the continuance of the contract and the date of termination of the contract should have been submitted to the jury for determination. *Page 302 
The fifth assignment of error asserts that:
 "The court erred in refusing to give to the jury appellant's requested Instruction VII, as follows:
 `In the event you should find that the defendant accepted orders for the burners in question, it will then become your duty to determine whether the defendant was required, under the terms of the agreement and under the circumstances then existing, to supply such burners to the plaintiff. In this regard, I instruct you that the alleged agreement was insufficient to charge the defendant with a positive duty to furnish such oil burners as the plaintiff might require, the evidence being that under the alleged agreement the delivery of burners to plaintiff was contingent upon there being burners available for plaintiff's use under an allocation plan adopted by defendant to insure a fair allocation of burners among its various dealers. Therefore, unless you should find by a preponderance of the evidence that there was such a supply of burners available, in accordance with such allocation plan, your verdict must be for the defendant as to this cause of action'".
The court gave the first sentence of the requested instruction but refused to give the balance. In view of the plaintiff's statement here that he does not claim a requirements contract, but only his fair quota, it appears that the instruction should have been given. In substance, the trial court submitted both the theory of a requirements contract, now abandoned, and the quota theory, to the jury.
The eighth assignment of error relates to the refusal of the court to give the requested instructions on the statute of frauds, which we have already set forth. Such refusal was reversible error. *Page 303 
By its eleventh assignment of error the defendant asserts that:
 "The court erred in giving to the jury the following instruction:
 `I instruct you that if you find from the evidence that plaintiff and defendant, through Mr. Mayne Read, its District Sales Manager, mutually agreed, assented and consented verbally to terms of an agreement under which plaintiff was given the exclusive right to sell at retail in Multnomah County, Oregon, oil burners manufactured by defendant, and defendant promised to furnish plaintiff with such oil burners for sale, and that Mr. Read had apparent authority to so act, or defendant ratified that authority, as I shall hereafter define ratification to you, such an agreement constitutes a valid and enforceable contract between the parties, and defendant was bound thereby, pursuant to such terms as you find was agreed upon, to furnish to plaintiff such oil burners and to refrain from making sales to any other person in Multnomah County, Oregon'".
The exception was taken upon numerous grounds, among them that the instruction ignored the elements of delivery schedules, allocations, and acceptance of orders by the defendant and failure to deliver due to causes beyond the control of the defendant. The instruction illustrates the confusion which runs through the entire case. The plaintiff never definitely asserted the theory on which he now alone relies. As a result the trial court was unable to state to the jury the express terms of the alleged contract on which plaintiff relied. The court was reduced to the expedient of instructing that if the plaintiff was given the exclusive right to sell oil burners and defendant promised to furnish such burners, the defendant would be bound "pursuant to such terms as you find was agreed upon". *Page 304 
The instructions which are attacked by the twelfth and thirteenth assignments of error are subject to the same criticism as was the instruction challenged by the eleventh assignment of error.
One other claim of prejudicial error should be mentioned. Concerning the first cause of action the court instructed the jury as follows:
 "* * * If you should find by a preponderance of the evidence that the delivery of burners to plaintiff was contingent upon there being burners available for plaintiff's use under an allocation plan adopted by defendant to insure a fair allocation of burners among its various dealers, then that would require you to find that they were not compelled under any agreement to furnish all the burners that plaintiff might have desired, so that unless you should find by a preponderance of the evidence that there was such a supply of burners available in accordance with such allocation plan, your verdict should be for the defendant as to this cause of action. And the burden of proof as to the plan of allocation and the shortage of burners is upon the defendant, and that must be shown to you by the defendant by a preponderance of the evidence, as I have defined preponderance to you."
The instruction was drawn on the quota theory on which plaintiff relies, but it erroneously places the burden of proof on the defendant to show the plan of allocation and the shortage of burners. The plaintiff had the burden of proof as to the terms of the contract and also had the burden of proving that the quota agreement entitled the plaintiff to more burners than were supplied him. The defendant took a proper exception to the instruction on the burden of proof, but has made no assignment of error upon that ground in its brief. *Page 305 
In the event of a second trial, the error should not be repeated.
The complete failure of the plaintiff to present the case in such form as to enable the trial court to submit clean-cut issues to the jury is shown by the fact that the plaintiff took exception to one of the instructions which we have already quoted. Counsel for plaintiff said:
 "Plaintiff excepts to the Court's giving of defendant's requested instruction No. VII, to the effect that unless the jury finds, by a preponderance of the evidence, that there was a supply of burners available in accordance with such allocation plan, the verdict must be for the defendant. * * *"
The instruction to which plaintiff excepted states the identical theory on which plaintiff now relies. Plaintiff supported his exception on the ground that "it affirmatively appears that there were burners available in that they were sold to persons whose orders were taken by the plaintiff and were cancelled." It is true that there was evidence to that effect, but it was for the jury to find whether plaintiff was entitled to them under the allocation plan and if so how many.
While the contentions presented in support of the defendant's motion for directed verdict were ably presented, and in each instance raise serious questions for determination, we have nevertheless concluded that the motion must be denied for reasons which we have set forth. In our opinion, neither party had a fair trial in which the issues were presented to the jury under circumstances calculated to produce an intelligent result. We are convinced that the contract was within the statute of frauds, that it was for the jury to say whether the delivery, acceptance, and payment were *Page 306 
exclusively referable to the alleged oral contract on which plaintiff relies, that that issue was not submitted to the jury and that other errors have occurred requiring that the judgment be reversed. The cause is therefore remanded for a new trial. In the event of a new trial the defendant will be entitled to judgment for the amount of his counterclaim, unless the amount thereof be set off against an equal or larger sum found due to the plaintiff.